NATIONAL MARITIME UNION OF AMERICA, AFL–CIO, et al., Plaintiffs,

v.

COMMANDER, MILITARY SEALIFT COMMAND, et al., Defendants.

Civ. A. No. 86–0089.

United States District Court, District of Columbia.

March 27, 1986.

James H. Heller, Kator, Scott & Heller, Washington, D.C., for Nat. Maritime Union.

Joseph E. Kolick, Clay Warner, Dickstein, Shapiro & Morin, Washington, D.C., for Districts 1 and 3, Marine Engineers Beneficial Ass'n.

Charles Flynn, Asst. U.S. Atty., Richard Haynes, John W. Rakow, Alan Mendelsohn, Duncan Hamner, Office of the Gen. Counsel, Dept. of the Navy, Military Sealift Command, Washington, D.C., for federal defendants.

Coleman S. Hicks, Newman T. Halvorson, Covington & Burling, Washington, D.C., William C. Miller, General Counsel, Lavino Shipping Co., Philadelphia, Pa., for defendant Lavino Shipping Co.

Mark Fox Evens, Keller & Heckmen, Washington, D.C., for intervenor-defendant Dist. 2, Marine Engineers Beneficial Assn.

Richard Gabriele, Schulman & Altman, New York City, Terry Yellig, Sherman, Dunn, Cohen, Leifer & Counts, P.C., Washington, D.C., for Seafarers Intern. Union of North America.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, Senior District Judge:

This proceeding, the third in a series of three cases dealing with the same government contract solicitation, presents a challenge to the award of a contract to operate twelve oceanographic vessels owned by defendant Military Sealift Command ("Sealift Command" or "MSC"). Plaintiffs assert that the award of the contract violated applicable provisions of the Service Contract Act of 1965 ("SCA" or "Act"), 41 U.S.C. §§ 351 *et seq.* (1982). The SCA establishes basic labor standards governing the award and performance of government contracts for services in excess of $2,500 where the principal purpose of the contract is to furnish services to the government through use of service employees. Plaintiffs also contend that the procedures followed after the award was made violated federal and agency procurement regulations.

Plaintiffs filed with their complaint a motion for preliminary injunction. Subsequently, all parties moved for summary judgment. For the reasons set forth below, the Court **denies** plaintiffs' motion for preliminary injunction as well as their motion for summary judgment. Defendants' motions for summary judgment are **granted** and the complaint is **dismissed**.

## INTRODUCTION

Plaintiffs in this proceeding are three unions. Plaintiff National Maritime Union of North America, AFL–CIO ("NMU") represents unlicensed seamen on nine of the twelve ships.[1] Plaintiffs District No. 1— Pacific Coast District, MEBA, AFL–CIO ("District 1") and District No. 3—Radio Officers' Union, MEBA, AFL–CIO ("ROU") represent licensed seamen on all twelve vessels. In addition, all three unions currently represent seamen employed by Marine Transport Lines ("Marine Transport" or "MTL"), the disappointed bidder on the contract at issue here.[2] Also named as a defendant along with Sealift Command is Lavino Shipping Company ("Lavino"), the winning bidder on the contract.[3] The relationships among the parties, as well as the background of this litigation, will be further explained below.

Plaintiff unions assert three separate interests in an effort to overturn or at least suspend the procurement at issue. First, claiming to represent the interests of future Lavino employees, plaintiffs seek rescission of the award as illegal insofar as it does not comply with the SCA. They contend that, because the contract did not contain a wage determination prepared by the Department of Labor ("Labor" or "DOL") specifying the minimum level of wages to be paid, the contract award was invalid. Second, plaintiffs assert that performance of the contract must at least be suspended

---

1. Unlicensed seamen on the other three vessels are represented by Seafarers International Union ("SIU"), which has been granted leave to intervene as a party-defendant.

2. Marine Transport is not a party to this proceeding.

3. Lavino has signed an exclusive bargaining agreement with District 2, MEBA–AMO, AFL–CIO ("District 2"), which has been granted leave to intervene as a party-defendant.

for a period of time during which civil service mariners ("CIVMARS") currently manning the ships and represented by plaintiffs could appeal the decision to contract-out the operation of the vessels to private employers. Finally, plaintiffs seek a declaration that temporary as well as permanent CIVMARS are entitled to a right of first refusal of employment with Lavino or any other winning bidder.

## BACKGROUND

As mentioned previously, the matter presently before the Court is the third in a series of suits directed at the contract for operation of the twelve Sealift Command vessels. The decision to let the contract in the first instance was the result of compliance with Office of Management and Budget ("OMB") Circular A–76, which mandates that, when feasible, services that can be more cheaply performed by the private sector than in-house should be contracted-out to the lowest bidder. Implementing regulations provide that affected parties may appeal the results of the cost comparison procedure established by the Circular. Accordingly, on March 15, 1984, the Sealift Command issued a Request for Proposal ("RFP") seeking bids on the contract to be compared with the government's cost estimate. Initial offers were received on or about February 1, 1985, after which a "competitive range" was established that included Lavino, Marine Transport and one other bidder. Best and final offers were received on April 15, 1985, on the basis of which a tentative award was made to Marine Transport. Pursuant to the Navy's administrative appeal procedure, cost comparison appeals were filed by various parties interested in the procurement; all were denied on July 18, 1985. Because the original RFP did not require compliance with the provisions of the SCA, the Seafarers

International Union ("SIU"), which represents unlicensed seamen on three of the twelve vessels,[4] filed suit[5] in this Court on July 29 to enjoin performance of the contract.

Subsequent to the filing of SIU's complaint, Labor notified Sealift Command that the Act did in fact apply to the solicitation and that corrective action needed to be taken. On August 9, 1985, representatives of the Departments of Justice, Labor, and the Navy met, at which time the Justice Department announced that the official government position was that the SCA applied to solicitations such as the one at issue. Accordingly, on August 16, MSC amended the solicitation (Amendment 0018), rescinding the tentative award to Marine Transport and requesting that new best and final offers be received after the completion of an SCA wage determination by the Labor Department.[6]

The wage determination that was to be incorporated into the RFP was requested from the Labor Department on August 28, 1985. At that time and again on September 30, the Sealift Command and the Department of the Navy advised Labor of the need to prepare a wage determination that reflected the current downward trend in wages being paid to seamen by the private sector. On October 4, after it was apparent that such a wage determination could not be prepared within 60 days of its request as required by the applicable regulations,[7] Military Sealift issued an additional amendment to the RFP (Amendment 0019). That amendment, together with subsequent amendments, set a date for the submission of revised best and final offers and provided that the successful bidder would be required to pay SCA wages, in accordance with the wage determination to be issued,

---

4. See supra note 1.

5. Seafarers International Union v. Donnelly, et al., C.A. No. 85–2423. MTL was named a defendant in that action, while the plaintiff unions here moved to intervene as party-defendants. That case, which involved two other solicitations as well, is still pending.

6. As a result of MSC's decision to apply the SCA to the solicitation, SIU withdrew its motion for a preliminary injunction.

7. 29 C.F.R. § 4.4(a)(1) (1985). See discussion, infra.

retroactive to the date of the contract award.

On the same day that Amendment 0019 was issued, Marine Transport filed suit in the District for New Jersey to enjoin resolicitation of the contract. On October 22, that proceeding, on the government's motion, was transferred to this District.[8] On November 20,[9] this Court granted defendants' motion for summary judgment and the proceeding was dismissed. Thereafter, the resolicitation proceeded apace, culminating in the award to Lavino on December 12, 1985.

As of the date of the award to Lavino, no wage determination had been announced by DOL. In addition, Sealift Command announced that there would be no new cost comparison appeals period and that only permanent CIVMARS would be entitled to exercise their rights of first refusal. Claiming that these alleged deficiencies were fatal and illegal, the plaintiffs, on January 14, 1986, filed this suit to set aside the procurement.

## STANDARD OF REVIEW

Before turning to the merits of plaintiffs' case, it would be well to note the standard to be observed by the Court in gauging the propriety of defendants' conduct and what burden plaintiffs must meet in order to prevail. Our Circuit Court has made it clear that in government contracts disputes, the disappointed bidder who challenges a procurement decision

> bear[s] a heavy burden of showing either that (1) the procurement official's decisions on matters committed primarily to his own discretion had no rational basis, or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations.

*Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C.Cir.1973). A review of the contracting agency's conduct, on the other hand, should be undertaken bearing in mind two considerations that militate against overturning a government procurement. First, "the strong public interest in avoiding disruptions in procurement" must be outweighed by "an overriding public interest 'in having agencies follow the regulations which control government contracting'" before judicial intervention in the process is warranted. *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1300 (D.C. Cir.1971) (quoting *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859, 864 (D.C.Cir. 1970)). Second, the Court must be cognizant of its institutional limitations in a situation in which it "is at one and the same time confronted with a number of technical procurement statutes and regulations, contract provisions and specifications, and asked to determine expeditiously whether the procurement should proceed." *Id.* at 1301. Those considerations, which govern the scope of review in cases brought by disappointed bidders under *Scanwell Laboratories*, apply equally to actions brought by unions to enforce the SCA. *See, e.g., District 2, Marine Eng'rs Beneficial Ass'n v. Military Sealift Command*, 89 Lab.Cas. (CCH) ¶ 33,925 at 49,288 (D.D.C.1980) (procurement decision judged by "rational basis" test).

## ANALYSIS

Plaintiffs challenge the procurement at issue here on three fronts. Each of these challenges will be considered in turn, both as to plaintiffs' standing to bring their claims and as to the merits of those claims.

### A. Service Contract Act Claims

#### 1. Standing

The weight of authority seems to bear heavily against granting standing under the SCA to a union which does not represent employees of the company awarded the contract at issue. *See, e.g., American Federation of Government Employees, AFL–CIO v. Stetson*, 640 F.2d

---

8. The action in this Court was captioned *Marine Transport Lines, Inc. v. John F. Lehman, et al.,* C.A. No. 85–3437. SIU was granted leave to intervene as a party-defendant in that suit.

9. *Marine Transport Lines, Inc. v. Lehman,* 623 F.Supp. 330 (D.D.C.1985).

642, 645–46 (5th Cir.1981); *American Federation of Government Employees, Local 1668 v. Dunn,* 561 F.2d 1310, 1312–13 (9th Cir.1977). The reasoning of those cases denying standing under the SCA is that the Act was designed to protect from substandard wages those employees of private contractors performing work previously done in house. Consequently, only the employees of the successful bidder are within the "zone of interests" protected by the Act, *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 475, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982), and hence only they have standing to challenge any violations thereof. The rule limiting standing to unions that represent employees of the winning bidder has been adopted in this Circuit.[10] *See, e.g., American Federation of Government Employees, Local 1872 v. Stetson,* 86 Lab.Cas. (CCH) ¶ 33,819 (D.D.C.1979).

If plaintiffs are to surmount the standing requirement, they must allege that they do in fact represent employees of the successful bidder, in this case Lavino. Of the three plaintiff unions two—District 1 and ROU—cannot possibly make such a showing. Employees who might otherwise be represented by those unions—Lavino's licensed seamen—will be represented instead by District 2.[11] Which union will be representing Lavino's unlicensed seamen has not yet been determined. Consequently, NMU asserts that it most likely will represent some Lavino employees because it currently represents a portion of the CIVMARS who, by exercise of their rights of first refusal, may obtain employment with Lavino. Whether this will be so, however, is a matter of speculation. The record is unclear as to whether Lavino's unlicensed seamen are to be represented by a single union or several. If the former,

even assuming that every former NMU member again choose that union as his bargaining agent, a majority of Lavino's unlicensed seamen would have to be former NMU members, having come either from MSC or from union hiring halls, in order for NMU to win a union election.[12] Even if NMU would be able to share representation with one or more other unions, it is far from certain that any Lavino employees would choose that union. Moreover, it is entirely possible that Lavino's crew may contain no former NMU members, depending upon the operation of the right of first refusal process and outside hiring patterns. NMU's interest in protecting Lavino employees is, then, the type of purely speculative interest that is insufficient to confer standing. *See Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 46, 96 S.Ct. 1917, 1928, 48 L.Ed.2d 450 (1976); *Warth v. Seldin,* 422 U.S. 490, 507, 95 S.Ct. 2197, 2209, 45 L.Ed.2d 343 (1975).

To the extent that plaintiffs cannot successfully assert that they represent employees or future employees of Lavino, they have no standing to bring their claims under the SCA. Not only do they not fall within the relevant "zone of interests" protected by the Act, but their interests are antithetical to those of the persons who *do* come within SCA protection. Plaintiffs seek to assert the interests of Lavino employees only to defeat those interests by having the contract resolicited. While in certain instances a party may achieve standing by asserting the interests of third parties, such a ploy is never allowed where the interests of those third parties will in fact be thwarted by the party seeking standing. *Dunn,* 561 F.2d at 1313. Wariness of such a result certainly counsels

---

**10.** The D.C. Circuit has not had occasion, apparently, to examine the issue of a union's standing under the SCA, except in cases in which the union did represent employees of the winning bidder, as in *International Ass'n of Machinists and Aerospace Workers, AFL–CIO v. Hodgson,* 515 F.2d 373 (D.C.Cir.1975). However, there is

no reason to believe that this Circuit would not follow the lead of the Fifth and Ninth Circuits.

**11.** *See supra* note 3.

**12.** NMU is, of course, competing with SIU for representation of Lavino's unlicensed mariners.

against granting plaintiffs standing in this action.[13]

## 2. Merits

Even were lack of standing not fatal to their claims, plaintiffs would not succeed in demonstrating either that the SCA or applicable procurement regulations had been violated, or that the Sealift Command acted arbitrarily or capriciously as to matters committed to its discretion. *Kentron Hawaii, Ltd.*, 480 F.2d at 1169.

■ A review of the history of this procurement, as seen against the background of the applicable regulations, does not reveal a departure from proper procurement procedure at any time. In August of 1985, once it understood the Act to cover the solicitation, Sealift Command decided to resolicit the contract, notwithstanding the prior tentative award to Marine Transport. That decision was fully consistent with the applicable regulations, *see* 48 C.F.R. §§ 15.-606, 15.611(c) (1985), and was a proper exercise of agency discretion.[14] Although a subsequent wage determination could have been incorporated into the award, 29 C.F.R. § 4.5(c)(2) (1985); *District 2, Marine Eng'rs Beneficial Ass'n v. Military Sealift Command*, 89 Lab.Cas. (CCH) ¶ 33,925 (D.D.C.1980), the Navy determined instead that, because labor costs were such a significant factor in the preparation of a bid, new best and final offers had to be received in order to determine whether Marine Transport would remain the low bidder.[15] That decision was fully supported by a rational basis.

■ Similarly, although no wage determination has yet been prepared, the Sealift Command is free to apply a future wage determination retroactively to the contract. 29 C.F.R. § 4.5(c)(1) (1985). What distinguishes the situation at present from that facing MSC in August of 1985 is that, once the RFP was amended to put bidders on notice that SCA wage rates would apply, the bidders were in a position to adjust the wage components of their bids accordingly. Even though no wage rate had actually been set by DOL, each bidder was sufficiently familiar with the wage rates prevailing in the industry to determine with reasonable accuracy what impact SCA compliance would have on their bids.[16] It was then entirely reasonable for MSC to conclude that sufficiently accurate bids had been obtained in the resolicitation to warrant an award to Lavino even though no wage determination had yet been received.

Because the actions of the Sealift Command, both in rescinding the award to Marine Transport and granting the contract to Lavino, were consistent with applicable regulations and with the proper exercise of agency discretion, the procurement must be allowed to go forward. In addition, because there was a rational basis for those actions, plaintiffs cannot demonstrate that the government arbitrarily treated either Marine Transport or Lavino any differently. Any disparity in treatment was due only to the fact that the two companies were in fact differently situated at the relevant points in time. Accordingly, plaintiffs' SCA claims are without merit.[17]

---

**13.** It is significant that the one union that now has an exclusive bargaining agreement with Lavino, District 2, is aligned with the defendants in this proceeding. Conversely, District 1 and ROU, who will never represent Lavino employees, cannot seriously claim that they are looking out for the interests of those employees. And insofar as NMU's representation of Lavino employees is entirely speculative, that union is in no better a position in this regard than its two co-plaintiffs.

**14.** *Marine Transport Lines, Inc. v. Lehman*, 623 F.Supp. 330, 336 (D.D.C.1985).

**15.** Declaration of Frances C. Gapp ¶ 7, submitted in *Marine Transport Lines v. Lehman*,

Civil Action No. 85–4750 (D.N.J.). That affidavit appears in plaintiffs' Appendix in support of their motion for preliminary injunction.

**16.** In fact, SCA compliance evidently did have an impact on the respective bids of Marine Transport and Lavino. While those bids were initially $79.6 and $81.3 million, respectively, after resolicitation they were $81.7 and $79.8 million.

**17.** Plaintiffs assert that, in awarding the contract without a wage determination, MSC was impelled by some sort of improper motive. Nothing that plaintiffs have turned up through the discovery granted them after the filing of dispositive motions lends support to that theory.

## B. Denial of a Second Round of Appeals

### 1. Standing

■ As noted, all three plaintiff unions represent CIVMARS currently manning the twelve vessels. While those employees may be concerned lest the services that they are performing be unnecessarily contracted-out, OMB Circular A–76, which governs the contracting-out determination, provides no private right of action.

In *American Federation of Government Employees, Local 1872 v. Stetson*, 86 Lab.Cas. (CCH) ¶ 33,819 (D.D.C.1979), the court held that the purpose of Circular A–76 was as a "policy or managerial tool to aid the exercise of agencies' independent discretion." *Id.* at 48,851 (citations omitted). Because "[i]t does not create a rule of law, a private right of action, or confer any procedural benefits," reasoned the court, "[affected individuals] cannot fall within any 'zone of interest' protected by the Circular." *Id.* (citation omitted). Accordingly, plaintiffs lack standing to challenge any impropriety in the cost comparison determination.

### 2. Merits

■ Plaintiff unions lack standing to enforce the provisions of Circular A–76 because those provisions do not protect any interests that plaintiffs can claim. Conversely, even if plaintiffs did have standing, they would find that Circular A–76 grants them no substantive rights that they could enforce. The applicable Department of Defense ("DOD") regulations provide that the appeals period established to challenge decisions to contract-out services cannot be used to challenge the decision to award the contract to one bidder rather than another. 32 C.F.R. § 169a.3(i)(1) (1985); 32 C.F.R. § 169a.18(a)(1)(i), 50 Fed. Reg. 40,804, 40,812–13 (Oct. 7, 1985). While the bids of Marine Transport and Lavino, both before and after resolicitation, were remarkably close, the government's bids always trailed woefully behind by some $35 million, or 44 percent. Hence, it cannot realistically be said that any further appeals would serve the purpose of challenging the initial decision to contract-out. If plaintiffs were granted a second round of appeals, which in any event would only require a brief suspension of the procurement, it would be clearly an exercise in futility. Plaintiffs have adduced no previously ignored cost factor that would suddenly permit the government to trim $35 million from its bid and overtake Marine Transport and Lavino.

Even if it were conceivable that a second round of appeals would turn up some information to cast doubt on the accuracy of the government's bid, the administration of the appeals procedure is a matter left wholly to agency discretion and is thus free from judicial scrutiny. Applicable procurement regulations provide that:

> The appeals procedure is to provide an administrative safeguard to ensure that DoD Component decisions are fair, equitable, and in accordance with procedures in this part. The procedure does not authorize an appeal outside the DoD Component or a judicial review.

32 C.F.R. § 169a.18(a)(2), 50 Fed.Reg. 40,-804, 40,813 (Oct. 7, 1985). Clearly, the determination to contract-out is not reviewable by the Court. If the outcome of such an appeals procedure is not reviewable, then one would think that the refusal to grant such a procedure would also be non-reviewable. Yet plaintiffs have alleged a property interest in the procedure itself, which interest they say has been "taken" by the government. The question then arises of whether, by withholding a procedure which its own regulations mandated, the government deprived plaintiffs of a property interest, an interest that may exist regardless of whether the outcome of the procedure in question would be judicially reviewable.

Because the scope of plaintiffs' interest, if any,[18] is defined by DOD and Navy regu-

---

**18.** The Court assumes, only for the sake of argument, that plaintiffs have demonstrated a "liber-ty" or "property" interest in the cost comparison procedures at issue. Such a showing, of course,

lations, a finding that the Sealift Command did in fact comply with those regulations will be sufficient to answer plaintiffs' "taking" argument. The applicable DOD regulations are those found at 32 C.F.R., discussed *supra*. Those regulations have been incorporated by the Navy in OPNA-VINST 4860.6C at 495B, which provides that the appeals process may only be used to challenge an initial determination to contract-out. In concluding that a second round of appeals would have nothing to do with such a determination, MSC may be said to have properly exercised its inherent discretion to interpret and administer its own regulations. *See American Maritime Ass'n v. United States*, 766 F.2d 545, 560 (D.C.Cir.1985) (citing *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965)). Plaintiffs can ask for nothing more. Their interest in the cost comparison procedure can rise no greater than is permitted by the regulations that create that interest. *See Arnett v. Kennedy*, 416 U.S. 134, 152–55, 94 S.Ct. 1633, 1643–44, 40 L.Ed.2d 15 (1974). And if those regulations limit the exercise of that interest, plaintiffs will simply have to "take the bitter with the sweet." *Id.* at 154, 94 S.Ct. at 1644.

In sum, even if plaintiffs had standing to challenge the denial of a second round of appeals, they would find that they are owed nothing that has not previously been granted and that nothing has been "taken" from them.

## C. Right of First Refusal

### 1. Standing

■ Plaintiffs' claims arising out of MSC's denial to temporary CIVMARS of a right of first refusal with respect to Lavino employment fare no better than any of their other claims in surmounting the barrier of standing.

The regulations defining the scope of the right of first refusal are found at 32 C.F.R. § 169a. Section 169a.1, however, indicates that the provisions that follow are meant

must be made before one can argue that the

only to implement the directives of Circular A–76. And as discussed *supra*, that Circular provides no judicially enforceable substantive rights. It follows, then, that any regulations implementing the Circular provide no rights of action either.

### 2. Merits

Plaintiffs' argument that a right of first refusal must be extended to temporary CIVMARS proceeds from the premise that, because the applicable regulations and contract clauses grant that right to "any employee," the right must be accorded both temporary and permanent employees.

Applicable Federal Acquisition Regulations require that each contract subject to its provisions include a clause granting displaced employees a right of first refusal. 48 C.F.R. § 7.305(c) (1984). *See also* 32 C.F.R. § 169a.17(d)(4), 50 Fed.Reg. 40,804, 40,811 (Oct. 7, 1985). That clause, found at 48 C.F.R. § 52.207–3 (1985), merely requires that "[t]he Contractor shall give Government employees displaced as a result of the conversion to contract performance the right of first refusal for employment openings under the contract...." Such a clause was included in the RFP and, presumably, the contract. MSC App. at 104 (Cls. H–2, H–2.1).

Because the right of first refusal clause does not state which employees are to be granted that right, one must look elsewhere for guidance. The regulations implementing Circular A–76 define "displaced DoD employee" as "any DoD employee affected" by a decision to contract-out services. 32 C.F.R. § 169a.3, 50 Fed. Reg. 40,804, 40,805–06 (Oct. 7, 1985). Again, however, no indication is given as to what employees are meant to have that right.

■ Yet even if the applicable regulations might otherwise be construed to grant the right of first refusal to any employee, one must be cognizant of the fact that those regulations, for the same reason that they do not give rise to private rights of action, do not confer enforceable entitle-

interest in question has been "taken."

ments to employment upon any class of individuals. Accordingly, the issue of who is to benefit from the right of first refusal is a matter to be decided by the contracting agency in an exercise of its discretion. The Sealift Command made precisely such a decision, and that decision is supported by a rational basis. Citing concerns that the special circumstances faced by CIVMARS generally would make it difficult for permanent CIVMARS to obtain jobs elsewhere in the government,[19] MSC requested and obtained permission from the Chief of Naval Operations to exclude temporary employees from the first refusal process. Declaration of Michelle L. Lewis ¶¶ 5–6, MSC App. at 21–22. While the Court might in the first instance weigh differently the relative needs of permanent as opposed to temporary CIVMARS, it is not for the Court to substitute its judgment for that of the agency. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *American Financial Services Ass'n v. Federal Trade Comm'n*, 767 F.2d 957, 985 (D.C.Cir.1985). Accordingly, the decision to restrict the right of first refusal to permanent CIVMARS, supported as it was by a rational basis, must be upheld.

### CONCLUSION

Plaintiffs' several challenges to the procurement at issue in this case do not survive judicial scrutiny. Plaintiffs lack standing to raise any of their claims; accordingly, none will survive a motion to dismiss. Alternatively, even if plaintiffs had standing, their claims are not meritorious and certainly not of sufficient weight to override the strong public interest in having the procurement go forward as scheduled. For this reason, and because

there are no material facts in dispute, defendants are entitled to judgment as a matter of law.[20]

An appropriate Order will be entered.

---

**19.** The reasoning was that CIVMARS generally have a hard time finding other positions in the government where they can put their skills to work. Consequently, even if they retain rights to government employment by virtue of their reduction in force ("RIF") retention standing, they cannot obtain other government work. If temporary employees, then, were granted rights of first refusal, there would be too much competition for jobs with private contractors and, hence, permanent CIVMARS would suffer inordinately with regard to employment opportunities in both the public and private sectors.

**20.** In view of the disposition of this matter as set forth in this Memorandum Opinion and accompanying Order, plaintiffs' outstanding motion to compel discovery is considered moot.