**NATIONAL MARITIME UNION OF AMERICA, AFL–CIO, et al.,**
**Appellants,**

v.

**COMMANDER, MILITARY SEALIFT COMMAND, et al.**

No. 86–5210.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 11, 1986.

Decided July 31, 1987.

Joseph E. Kolick, Jr., with whom Angelo V. Arcadipane, Clay Warner, James H. Heller, Jennifer R. Levin, Washington, D.C., and Ned R. Phillips, New York City, were on joint brief, for appellants.

Charles F. Flynn, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth, R. Craig Lawrence and Michael J. Ryan, Asst. U.S. Attys., Washington, D.C., were on brief, for the federal appellee.

Coleman S. Hicks, Newman T. Halvorson, Jr. and Timothy J. O'Rourke, Washington, D.C., were on brief, for appellee, Lavino Shipping Co.

Richard Gabriele, New York City, was on brief, for appellee, Seafarers Intern. Union. James M. Altman, New York City, entered an appearance for appellee.

Joseph Dinsmore Murphy, Washington, D.C., was on brief, for appellee, District 2, Marine Engineers Beneficial Assn—AMO, AFL–CIO.

Before BORK, STARR and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge BORK.

BORK, Circuit Judge:

Appellants, three labor unions, brought suit in district court to obtain a declaration that a government contract awarded by the Military Sealift Command to Lavino Shipping Company was void and to enjoin the contract's performance. The district court dismissed the suit, holding that appellants lacked standing. We agree with the district court that appellants lack standing to pursue their claim under the Service Contract Act. Without deciding whether appellants have standing to pursue their other claims, we hold for appellees on the merits of those claims.

## I.

## A.

In 1984, the Military Sealift Command ("MSC"), a unit of the Department of the Navy, was operating twelve government-owned oceanographic ships with civil service mariners of both "permanent" and "temporary" tenure. Many of these seamen were represented by appellant unions. Pursuant to regulations implementing Office of Management and Budget ("OMB") Circular A–76, which provides a framework of policies and procedures to facilitate the performance of governmental activities by private firms, the MSC undertook to compare the cost of contracting with a private firm to operate the ships and the cost of its own continued operation of the ships. It issued a solicitation requesting bids from private firms to operate the ships and in the meantime prepared its own estimate of the cost of continued government operation. This solicitation did not require the winning bidder to pay specified minimum wages and fringe benefits or otherwise to comply with the Service Contract Act (the "Act"), 41 U.S.C. §§ 351–358 (1982).

Upon analysis of the bids from private firms, the MSC found that three bids, including those of appellee Lavino and of Marine Transport Lines, Inc. ("Marine Transport"), were competitive. Upon receipt of best and final offers from these three bidders, and upon comparison with the cost estimate for continued government operation, the MSC tentatively awarded the contract to Marine Transport. All persons directly affected by this action, including all civil service mariners and their labor representatives, were notified and given an opportunity to appeal certain issues administratively to the office of the Chief of Naval Operations. All appeals taken were denied.

But as a result of a conclusion by the government that the Act did apply to this solicitation and contract award, the MSC rescinded the tentative award, advised the three competitive bidders of the Act's appli-cability, requested new best and final offers from the bidders and a new cost estimate from the government and announced that a future amended solicitation would contain mandatory wage levels determined by the Labor Department in accord with the Act. In response, Marine Transport brought suit, contending that the Act did not apply to the procurement. The district court granted summary judgment to the government, holding that the decision to call for new bids was proper and that the Act did apply to the procurement insofar as the ships would operate within American territorial waters. *Marine Transp. Lines, Inc. v. Lehman,* 623 F.Supp. 330 (D.D.C. 1985).

The solicitation as ultimately amended required the winning bidder to agree to pay, retroactively to the date of the award, wage rates and benefits to be specified by the Labor Department. The solicitation at no point provided any schedule specifying these wages and benefits because the Labor Department, without a data base for these positions, could not prepare a timely schedule.

Of the new best and final offers reflective of this and other amendments to the solicitation, Lavino's offer now was lowest, and it was awarded the contract.[1] The MSC also then announced that the government would not grant an administrative appeal from this award, since it found that all issues appealable administratively could and should have been raised in the appeal from the first tentative award to Marine Transport.

Both the government's request for bids and the ultimate contract awarded to Lavino required the winning bidder to grant government employees displaced by the contract's performance a right of first refusal to any job openings under the contract. The MSC determined that displaced permanent civil service mariners would find it unusually difficult to obtain positions elsewhere in government or in the

---

1. In the original round of offers, Marine Transport bid $79,576,560, Lavino $81,333,912, and the government $115,107,309. On the solicita-tion as ultimately amended, Lavino bid $79,-750,778, Marine Transport $81,720,435, and the government $114,798,090.

private sector. Therefore, to avoid burdening the permanent mariners with additional competitors for job openings under the contract, the MSC decided that the contract award's condition did not require a grant of the first-refusal right to displaced temporary civil service employees.

### B.

The National Maritime Union of America, AFL–CIO, and two other unions (here referred to collectively as "the Unions") represent civil service mariners as well as employees of Marine Transport;[2] none of the appellant unions represent employees of Lavino.[3] The Unions filed suit in the district court, asking the court to enjoin performance of the contract and to require MSC to vacate the award to Lavino and resolicit the contract upon receipt of a wage determination. In the alternative, the Unions asked the court to require the MSC to grant the Unions an administrative appeal from the Lavino award and to require Lavino to grant first-refusal rights to displaced temporary civil service mariners. To support their claims for relief, the Unions asserted that the Lavino award was illegal under the Act because neither the solicitation nor the contract contained a wage determination, and that MSC's refusal to permit an appeal from the award and its decision on the first-refusal point contravened provisions of OMB Circular A–76 and its implementing regulations.

On cross-motions for summary judgment, the district court dismissed the Unions' suit for want of standing. *National Maritime Union v. Commander, Military Sealift Command,* 632 F.Supp. 409 (D.D.C. 1986). The court held that the Unions were not within the zone of interests of the Act, since they did not represent employees of the winning bidder, whom the Act protects. *Id.* at 413–15. The court further held that since Circular A–76 merely represents a managerial tool that does not give rise to any protected private interest, the Unions did not have standing to bring any claim based on the Circular. *Id.* at 416, 417. This appeal followed.

### II.

The Unions allege injury to their members, in whose behalf they sue as representatives.[4] To attain representative standing, the Unions must show that: their members individually would have standing to bring the same claims; the interests the Unions protect by bringing the claims are germane to the Unions' purposes; and neither the claim nor the relief sought requires individual members to participate in the litigation. *See Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). The first point, which requires an analysis of the standing of an individual union member, is discussed in detail below.[5] We here address the conten-

---

**2.** Appellant National Maritime Union represents unlicensed seamen on 9 of the 12 ships involved; appellant District No. 1—Pacific Coast District, Marine Engineers' Beneficial Association represents licensed engineering officers on all 12 ships; appellant District No. 3—Radio Officers Union, Marine Engineers' Beneficial Association represents radio officers on all 12 ships.

**3.** Two labor unions also intervened in behalf of defendants. Appellee District No. 2—American Maritime Officers, Marine Engineers' Beneficial Association—AMO, AFL–CIO represents all licensed officers, including radio officers, who operate the oceanographic ships for Lavino. Appellee Seamens International Union of North America, Atlantic, Gulf, Lakes and Inland Waters District, AFL–CIO represents unlicensed civil service mariners on the three ships where NMU is not the representative, as well as unli-

censed seamen employed by unsuccessful bidders for the challenged contract, and is seeking to represent unlicensed seamen employed by Lavino.

**4.** The Unions also argue that they have standing to sue in their own behalf as potential bargaining representatives of employees of Lavino who are not presently represented by a union. But the remedy the Unions seek—the voiding of the award to Lavino—runs precisely contrary to the interest the Unions might claim injury to, *i.e.,* their ability to organize or collect dues from Lavino employees. The Unions' only serious claim to standing is in their representative capacity.

**5.** The second requirement, germaneness, is clearly met. The Unions' purposes unquestionably include maximizing their members' employment. Overturning the contract award to Lavi-

tion that the Unions lack standing because the employees they represent have conflicting interests in the outcome of this litigation. That contention may be seen as an attempt to add a fourth factor to those specified by *Hunt* or as an aspect of the third. It is unnecessary to decide the proper category for present purposes. We conclude that whatever conflict there may be among the Unions' members in this case does not deprive the Unions of associational standing.

██ Most of the instances of contradictory interests among the Unions' members urged upon us may not truly present a contradiction, but we will not take the time to analyze these instances because there is one example that clearly presents a conflict. This is the Unions' request that the court require Lavino to grant first refusal rights to their displaced temporary civil servant members. The very reason given by MSC for denying the right to temporary mariners is that their exercise of the right could aggravate unemployment among permanent mariners, who of course are also represented by the Unions. We therefore

must decide whether the contrary interests of the temporary and permanent mariners, both of whom the Unions represent, operate to deny the Unions representative standing.[6]

The lower courts disagree on the point. *Compare Gillis v. United States Dep't of Health & Human Services,* 759 F.2d 565, 572–73 (6th Cir.1985) (upholding association's standing despite alleged harm to some members from victory in litigation) *with Associated Gen. Contractors v. Otter Tail Power Co.,* 611 F.2d 684, 691 (8th Cir.1979) (rejecting associational standing due to "actual and potential conflicts" among members' interests in the litigation). We conclude for a number of reasons that associational standing does not necessarily depend upon harmony of member interests. The first of these reasons is the very good one that we think the Supreme Court has decided the question.[7]

The Court, in *UAW v. Brock,* 477 U.S. 274, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986), arguably suggested that conflicting interests of members did not preclude associa-

---

no would make it possible for either civil service mariners to retain employment or prospective Marine Transport employees to obtain employment and would further this purpose.

**6.** The Unions argue that two decisions of this court support their contention that any conflict in the interests of their members is irrelevant. *International Ass'n of Machinists v. Hodgson,* 515 F.2d 373 (D.C.Cir.1975); *Kentron Hawaii, Ltd. v. Warner,* 480 F.2d 1166 (D.C.Cir.1973). But neither decision discussed the problem of conflicting member interests.

Their precedential value on this question of standing thus is minimal. *See Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 119, 104 S.Ct. 900, 918, 79 L.Ed.2d 67 (1984). Moreover, it appears that in both *Hodgson* and *Kentron* the problem of conflicting interests did not exist because it was the same union members who were first employed by the displaced bidder and then retained by the successful bidder. *See Hodgson,* 515 F.2d at 377 (same members of same union now paid less for same jobs); *Kentron,* 480 F.2d at 1169.

**7.** The Supreme Court's statement in *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975), that, to obtain standing, "[t]he association must allege that its members, or any one of them" is injured is sometimes

cited as relevant to the problem of conflicts. It seems more likely that the Court was merely stressing that an association cannot have standing if none of its members would have standing. *Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), also seems inapposite. The Court found that a women's association lacked standing to challenge the Hyde Amendment's limits on Medicaid funding for abortions on the theory that the amendment interfered with the free exercise of religion guaranteed by the first amendment. The association conceded a diversity of views about abortion among its members and the Court said "the participation of individual members ... is essential to a proper understanding and resolution of their free exercise claims." *Id.* at 321, 100 S.Ct. at 2690. The Court had just quoted *Abington School Dist. v. Schempp,* 374 U.S. 203, 223, 83 S.Ct. 1560, 1572, 10 L.Ed.2d 844 (1963), to the effect that "it is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion." Given the wide diversity of effects in *McRae,* the Court appeared to be saying it needed the participation of individuals to determine the application of the guarantee in a variety of circumstances. This is not, we think, a ruling that an association cannot take a position contrary to the interests of some members. *McRae* was a case where quite particularized information was required.

tional standing. The defendant Secretary of Labor asked the Court to overrule *Hunt,* do away with associational standing, and require members of an association to sue only under class action procedures. The Secretary said that the class action had safeguards to ensure that the diverse interests of members are properly represented but that associational standing, as the Court had approached it, did not contain such safeguards. Paraphrasing the Secretary's argument, the Court said "an association might prove an inadequate representative of its members' legal interests" because, among other things, it "might bring lawsuits without authorization from its membership" or "the litigation strategy selected by the association might reflect the views of only a bare majority—or even an influential minority—of the full membership." *Id.* at 2532.

Significantly, the Court did not respond by denying these points but instead stressed the other benefits of associational standing, 106 S.Ct. at 2532–33,[8] and then stated: "We are not prepared to dismiss out of hand the Secretary's concern that associations allowed to proceed under *Hunt* will not always be able to represent adequately the interests of all their injured members. Should an association be deficient in this regard, a judgment won against it might not preclude subsequent claims by the association's members without offending due process principles. And were we presented with evidence that such a problem existed either here or in cases of this type, we would have to consider how it might be alleviated." *Id.* at 2533. Thus, the Court appeared to deal with the prob-

lem of conflicting interests by saying that associational standing was too valuable to jettison and offering possible safeguards for members whose interests were adverse to the litigating position taken by the association.

If the Supreme Court's *UAW* opinion decided that associational standing is not defeated by conflicting member interests, as we rather think it did, we are, of course, bound by that. But the matter is not entirely clear and we should state why we would reach that conclusion in any event.

Most, or perhaps all, associations, even though created to serve the members' common interests, will have internal conflicts about appropriate organizational policies. Such conflicts are typically resolved by the association's internal procedures or political structure. Inevitably, some resolutions will harm some members' interests, but that is usually accepted as part of the cost of obtaining the benefits of association. Courts would ordinarily uphold an association's determinations against internal challenge unless it were shown that the organization's own procedures had been violated. It is not obvious to us that this rationale should not apply to an association's internal resolution of conflicts about litigating positions.

This is not to say that dissenting members, who are bound by the association's decision as to the association's litigating position, are also bound as individuals.[9] Without deciding the point, for no union dissidents are before us, several possibilities come to mind. Members, as individu-

---

**8.** In the *UAW* opinion the Court appears to assume that the benefits of the association's expertise would be lost if associational standing were denied and class action procedures required. It is not clear why this should be true. The association's leaders and legal counsel could organize and bring the class action, thereby adding the safeguards of that procedure to the litigating benefits the association provides.

**9.** Members adversely affected by an association's litigation victory might be able to relitigate the claim on which the association prevailed without operation of preclusion principles, *i.e.,* res judicata or collateral estoppel. But while the Court's *UAW* opinion suggests that an

organization's litigation *loss* "might not preclude subsequent claims by [its] members without offending due process principles," 106 S.Ct. at 2533, this dictum, if followed, still would not determine the preclusive effect of an organization's litigation *victory.* In any event, we do not rely on the absence of preclusion for our holding in this case.

It is also possible that members injured by a litigation victory may have a cause of action arising therefrom for breach of fiduciary duty or of the organization's by-laws, charter or governing statutes against those who initiated the suit. But again, our analysis does not turn on the possibility of these remedies.

als or groups, if they had standing, could intervene to advance their interests in the merits against the association's position. It may be that they could challenge the association's standing by showing that the procedures for adopting a position had been ignored. A union might present a special case of this. If a union sought a litigation victory that would harm some workers to benefit others, that might give rise to a claim by employees in the bargaining unit that the union had breached its duty of fair representation. In such a situation, the union's duty of fair representation itself, if clearly implicated by the union's requested relief, could perhaps deprive the union of organizational standing. But that duty derives from and reaches no further than the union's authority as exclusive collective bargaining representative of the employees. *See Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 564, 96 S.Ct. 1048, 1056, 47 L.Ed.2d 231 (1976); *National Treasury Employees Union v. FLRA*, 800 F.2d 1165, 1169–70 (D.C.Cir. 1986). In this case, none of the Unions' claims is within the ambit of their exclusive bargaining authority and the duty of fair representation is not implicated. *See NTEU v. FLRA*, 800 F.2d at 1170.

For the reasons given, we think that the mere fact of conflicting interests among members of an association does not of itself defeat the association's standing to urge the interests of some members in litigation, even though success may harm the legal interests of other members. We hold, therefore, that the Unions have associational standing to maintain this suit so long as their members individually would have standing to maintain it. We now turn to the latter issue.

### III.

The law of standing comprises a set of constitutional and prudential requirements. *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975). We first apply the constitutional requirements to the Unions' claims.

▮ To ensure the presence of a "case" or "controversy," as article III of the Con-

stitution requires, a litigant must show that he has suffered injury as a result of the defendant's putatively illegal conduct and that his injury both may be traced to the challenged conduct and is likely to be redressed by the judicial relief he seeks. *E.g., Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). The distinction between the "traceability" and "redressability" requirements, two aspects of the causation requirement for standing, becomes pertinent when the litigant's injury is not traceable to the wrongful conduct he complains of, but the relief he seeks is so broad that it would nonetheless redress his injury. *See Warth*, 422 U.S. at 499, 95 S.Ct. at 2205; *Mideast Sys. & China Civil Constr. Saipan Joint Venture, Inc. v. Hodel*, 792 F.2d 1172, 1176 (D.C.Cir.1986). In addition, the relief the litigant seeks is crucial to the determination of his standing; he may possess standing as to one form of relief but not as to another. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (although damage standing available, injunctive standing not).

While it is undisputed that the Unions have article III standing to bring their claims based on OMB Circular A–76, we hold that they have failed to allege a causal connection between the alleged violation of the Service Contract Act and injury to any of their members.

### A.

The "remedial purpose" of the Service Contract Act is "to protect prevailing labor standards," 41 U.S.C. § 353(b) (1982); the Act is meant to prevent the government from "subsidizing" low wages to private-sector service employees by awarding government contracts to those who can bid low by paying low wages. *See American Fed'n of Gov't Employees, Local 1668 v. Dunn*, 561 F.2d 1310, 1312 (9th Cir.1977). To this end, the Act, *inter alia*, requires most government service contracts to contain a "provision specifying" the minimum wages and fringe benefits contract employ-

ees must receive from their private employer; the wages and benefits are specified by the Secretary of Labor in accordance with prevailing private wage and benefit levels for comparable employees in the locality. 41 U.S.C. § 351(a)(1), (2) (1982).

By definition, the Act has no effect on the wages the government pays its employees, but applies only to government contracts with private employers. The Secretary of Labor has the power to interpret, administer and enforce the Act. *See* 41 U.S.C. §§ 352–358 (1982). In particular, the Act establishes various sanctions the government may apply to contractors who fail to meet their contractual obligations to provide the wages and benefits established by the Secretary's determination: The government may pay monies due under the contract instead to the underpaid employees, *id.* § 352(a); the government may lawfully cancel the contract altogether, *id.* § 352(c); and the defaulting contractor is ineligible for any government contract awards for three years, *id.* § 354(a).

We see from this sketch of the Act that it bestows no legal right on any employees except those of the winning bidder and no legal duty on private employers or the government except with respect to those employees. Thus the Unions have not invoked the Act as a statute that of itself grants, as to them, "legal rights, the invasion of which creates standing." *Warth*, 422 U.S. at 500, 95 S.Ct. at 2206 (internal quote omitted).[10]

### B.

The Unions' complaint, which should be the primary vehicle by which a litigant assures the court of its standing, *see*

*Warth*, 422 U.S. at 501–02, 95 S.Ct. at 2206–07, does not provide a clear identification of the injury the Unions rely upon for their standing. Giving their complaint a generous interpretation, we believe the Unions have asserted two different injuries to their members: the loss of jobs by Union members displaced by Lavino employees pursuant to the contract award, and the loss of job opportunities by Union members who would have been employed by Marine Transport on the ships if Marine Transport had won the award. The Unions do not allege as injury any threat that Lavino will pay less than the prevailing wages and benefits yet to be determined by the Secretary of Labor. Indeed, the Unions could not allege any such injury in this case, since the contract specifically requires Lavino to pay, retroactive to the date of the award, whatever wages and benefits the Secretary ultimately determines to be "prevailing."[11]

■ The injury to the Unions' members, therefore, is simply the loss of present or future jobs as a result of the contract award. The violation of the Act alleged by the Unions is the award of a contract to Lavino that did not contain a specific wage and benefit determination from the Labor Secretary. Although we have no doubt that the Unions' injury constitutes a "distinct and palpable" injury sufficient to confer standing, *Warth*, 422 U.S. at 501, 95 S.Ct. at 2206, we hold that this injury is neither fairly traceable to the putatively illegal omission of a wage determination from the contract nor fairly redressable by the remedy the Unions seek. Nothing in the record suggests that Lavino would not have won the contract if the MSC had

---

10. Whether the Act creates a legal right, the invasion of which would constitute injury for purposes of standing, is a question wholly distinct from that of whether, given an independent injury in fact, the Act's zone of interests was intended by Congress to permit the plaintiff to assert his injury in fact. *See Clarke v. Securities Indus. Ass'n,* —— U.S. ——, 107 S.Ct. 750, 754–56, 93 L.Ed.2d 757 (1987).

11. In their complaint, the Unions allege that Lavino will fund the wages it must pay its employees under the Act while in American waters by reducing the wages it would other-

wise pay them while outside the American waters and not subject to the Act. According to this theory, the ultimate wage determination by the Secretary would be irrelevant to Lavino's (or presumably anyone else's) bid amount, and this court's ignorance concerning that determination's effect on the bids would be a blissful ignorance. But this approach depends on a claim of injury to Lavino's employees, whom the Unions do not represent and whom we have no reason to presume the Unions ever will represent.

delayed its award until it could incorporate a wage determination in the solicitation. On the Union's theory, the absence of a wage determination would have illegally tainted the contract no matter who had won it. If we gave the Unions the relief they seek by setting aside the award and ordering a resolicitation with a specific wage determination, the injury to their members might well not be cured by an award to Marine Transport or government retention of the ships' operation. Since substantial barriers to the alleviation of the Unions' injury would remain regardless of the outcome of this litigation, it is irrelevant, although true, that our setting aside the award would remove one "absolute barrier" to alleviation of the Unions' injury. *See Greater Tampa Chamber of Commerce v. Goldschmidt*, 627 F.2d 258 (D.C. Cir.1980).

There is not even an indication that Marine Transport would even be willing to re-bid if we granted the Unions the remedy they seek—indeed, Marine Transport's absence from this litigation strongly suggests the contrary. Nor is there any reason to believe that the government's own cost assessment, which is not affected by the Act's applicability, would materially change in a re-bidding. In addition, this court has no way of knowing what the wage determination by the Labor Secretary, who is not a party to this litigation, will be. And in calculating their bids, both Marine Transport and Lavino necessarily estimated what they believed the Secretary would ultimately determine the schedule of prevailing wages and benefits to be. *See National Maritime Union*, 632 F.Supp. at 415. This court also cannot know whether or how the wage and benefit levels assumed in the losing bid of Marine Transport would change relative to those assumed by Lavino, if these two bidders upon resolicitation recalculated their bids using whatever ultimate determination is actually issued by the Secretary. In sum, the small likelihood that Marine Transport would participate in a re-bidding with the wages the Act requires, the fact that the Act's applicability has no effect on the government's internal cost analysis, and the uncertainty about the effect of the private bidders' assumed wage and benefit levels on the bids in the second round of bidding all point to a single conclusion—that the injury to the Unions' members is causally speculative. *See Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 842 & n. 3 (D.C.Cir. 1982) (penultimate low bidder's standing to obtain maladministered government contract's resolicitation fails since likelihood of thereafter winning award merely "conjectural"); *see also American Soc'y of Travel Agents, Inc. v. Blumenthal*, 566 F.2d 145 (D.C.Cir.1977) (challenge by travel agents to tax treatment of travel programs of tax-exempt entities fails for want of standing, since claim that plaintiffs' business would improve absent challenged treatment speculative); *Public Citizen v. Lockheed Aircraft Corp.*, 565 F.2d 708 (D.C.Cir. 1977) (standing denied trade association to contest government asset sale due to speculativeness of injuries alleged); *American Fed'n of Gov't Employees v. Hoffman*, 427 F.Supp. 1048, 1082–83 (N.D.Ala.1976) (challenge by government employees to government labor contracts with third parties fails for want of standing due to lack of causation). We conclude that the presence in the causal chain of these "independent variables," *Mideast Sys.*, 792 F.2d at 1178, which depend on the decisions of third parties not before this court, defeats the Unions' standing. *See id.* at 1177 (where only result of remedy plaintiff seeks would be withdrawal of contracts from winning bidders and award of contract to plaintiff must come from third party not before court, plaintiff lacks standing).

### C.

The Unions have indirectly suggested that the analysis we have just set out would prove too much, because it would also deny standing to a disappointed bidder, such as Marine Transport. Disappointed bidders have had standing in this circuit to challenge government procurements since *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859, 861–73 (D.C.Cir. 1970). To clarify the scope of our holding,

we explain why the Unions' suggestion is mistaken.

First, if Marine Transport were a plaintiff in this litigation, its implicit assurance to this court that it "stands ready, willing and able" to re-bid would indicate that exercise of the judicial remedial power would not be in vain. *See Orange Park Florida T.V., Inc. v. FCC*, 811 F.2d 664, 672 & n. 18 (D.C.Cir.1987) (assurance of license applicant's intent to reapply contributes to satisfaction of causation requirement). Moreover, if Marine Transport were a party, the pleadings in this case could present the court with some account of the wage assumptions underlying Marine Transport's bid, thus reducing the conjectural character of the causal chain. Indeed, since Marine Transport had vigorously opposed the rescission of the initial award, we view it as at least possible, if not probable, that Marine Transport did not join this litigation because it believed that, even if it prevailed, it still would not be the low bidder.

■ But in addition to the far greater factual uncertainties that result from Marine Transport's absence is a distinction of law: A disappointed bidder that claims illegality in a procurement alleges an injury beyond its economic loss of the contract. The disappointed bidder may also claim injury to its right to a legally valid procurement process. *See CACI, Inc.-Federal v. United States*, 719 F.2d 1567, 1572–75 (Fed.Cir.1983); *B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 717–23 (2d Cir.1983) (Friendly, J.); *Control Data Corp. v. Baldrige*, 655 F.2d 283, 293 (D.C. Cir.1981) (overruled on other grounds by *Clarke v. Securities Indus. Ass'n*, —— U.S. ——, 107 S.Ct. 750, 757 n. 15, 93 L.Ed.2d 757 (1987)); *Dunn*, 561 F.2d at 1313; *Merriam v. Kunzig*, 476 F.2d 1233, 1242 n. 7 (3d Cir.1973); *Keco Indus., Inc. v. United States*, 428 F.2d 1233, 1236–38 (Ct.Cl.1970). This right is implicitly bestowed on all bidders by the mandatory language of the federal procurement statutes, *see, e.g.*, 10 U.S.C. §§ 2304, 2305 (Supp. III 1985), and by the contractual invitation to bid embodied in the solicitation. *See, e.g., CACI*, 719 F.2d at 1574.

Most of the cases that address the bidder's right to a valid procurement invoke the right as a means to resolve the zone-of-interest question, which is not an element of article III standing but an independent prudential limitation on standing. *E.g., B.K. Instrument*, 715 F.2d at 719–20; *Control Data*, 655 F.2d at 293. But we believe that reference to the bidder's distinctive legal right is essential to article III standing in a procurement challenge. Otherwise, lack of causation might often disable the bidder's simple reliance on economic injury in fact for its standing. We agree with the Federal Circuit, which in an excellent discussion of bidder standing responded to a suggestion that a disappointed bidder lacked standing due to a failure of causation:

> The flaw in the government's argument here is that it misconceives the nature of the injury that unsuccessful bidders seek to rectify in bid protest suits. *Scanwell* itself recognized that a disappointed bidder has "no right ... to have the contract awarded to it in the event the ... court finds illegality in the award of the contract...." 424 F.2d at 864. The injury CACI here asserts is that the government's breach of its implied contract to deal fairly with all bidders denied CACI the opportunity to have its bid considered solely on its merits. An injunction barring the award would correct this alleged injury since it would require the government, if it wants to go ahead with the procurement, to repeat the bidding process under circumstances that would eliminate the alleged taint of the prior proceedings.

*CACI*, 719 F.2d at 1575.[12]

In short, injury to a bidder's right to a fair procurement is obviously an injury

---

12. This is not to suggest that such an injured bidder would necessarily be able to obtain a valid re-solicitation, regardless of its actual likelihood of obtaining the award. Presumably a bidder who believed that it would have no significant likelihood of obtaining the bid on re-solicitation would not bring suit. If such a bidder nonetheless brought suit for its nuisance value, or for its legitimate bid preparation costs, its suit may be dismissed if the bidder was not

both traceable to the alleged illegality in a procurement and redressable by any remedy that eliminates the alleged illegality.[13]

Although their complaint is not wholly clear on this point, the Unions apparently do not attempt to invoke Marine Transport's legal right to a fair procurement in behalf of their members. But even if the Unions did clearly claim injury to this legal right, the right is Marine Transport's, not theirs, and thus could not provide them with a causally traceable and redressable injury. *See CACI,* 719 F.2d at 1574 ("only persons injured" by government's violation of duty of fair procurement are unsuccessful bidders).[14]

### IV.

We do not doubt that the Unions have article III standing in behalf of their members to challenge the MSC's denial of an administrative appeal from the Lavino award and its failure to require Lavino to grant first refusal rights to displaced temporary civil service mariners. The Unions allege that the mariners have a right to appeal and that the temporary mariners are entitled to a right of first refusal, which are legal rights allegedly created by regulation and contract. The injury to each of these rights is the immediate result of MSC's challenged actions and the remedies the Unions seek, an order to grant an administrative appeal and a right of first refusal to the affected mariners, would redress these injuries.

But the defendants argued, and the district court stated, that the Unions nonetheless lacked standing to bring these claims, because the interests they sought to assert by bringing the claims fell outside the "zone of interests" protected by OMB Circular A–76, which "provides no private right of action." 632 F.Supp. at 416, 417. We need not decide whether the Unions lack standing to pursue their A–76 claims under the prudential zone-of-interests test, or whether Circular A–76 and its implementing regulations give rise to a justiciable cause of action. Our resolution of these issues, which do not implicate our constitutional jurisdiction or statutory jurisdiction under 28 U.S.C. § 1331 (1982), would not be dispositive in any event, because even if the Unions' position on each of them is correct, we find that their A–76 claims fail on the merits.

### A.

OMB Circular A–76 sets out guidelines for federal agencies to follow in carrying out the general policy of the government to rely on competitive private enterprise to supply its goods and services except when government performance would be more efficient. The Circular states that the authorities for its issuance are statutes that create an Office of Federal Procurement Policy within OMB and authorize that office to issue uniform federal procurement regulations and procedures. Circular A–76, ¶ 3 (Aug. 1983); *see* 41 U.S.C. §§ 401, 405, 405a (1982 & Supp. II 1984). The

---

"within the zone of active consideration" for the bid's award. *CACI,* 719 F.2d at 1574–75, *quoting Morgan Business Assocs., Inc. v. United States,* 619 F.2d 892, 896 (Ct.Cl.1980).

**13.** Moreover, when a disappointed bidder asks not for a re-solicitation but simply for rescission and an award of the original contract to it, there would be no redressability problem even if the bidder could allege only economic injury (although traceability of that injury to the alleged illegality might remain an insuperable barrier). *See generally Delta Data Sys. Corp. v. Webster,* 744 F.2d 197, 203–06 (D.C.Cir.1984) (setting out permissible circumstances for such a remedy).

The leading case in this circuit granting a disappointed bidder standing to challenge a government procurement, *Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859, 861–73 (D.C.

Cir.1970), was decided prior to the Supreme Court's focus, in cases like *Warth,* on the causation element in the law of standing. Unsurprisingly, then, the *Scanwell* court did not give attention to the meaning of the causation requirement in the procurement context. Indeed, the *Scanwell* decision's emphasis on the disappointed bidder as "private attorney general," 424 F.2d at 864, is difficult to square with any reference to a causation requirement for standing, unless one analyzes the bidder's injury as an injury to its right to a legal procurement.

**14.** In view of our disposition of the Unions' article III standing regarding their claim under the Act, we do not reach the issue of whether the Unions are within the zone of interests that the Act protects (the basis on which the district court dismissed this claim).

Circular states that it "shall provide administrative direction" to agencies but does not "[e]stablish and shall not be construed to create any substantive or procedural basis for anyone to challenge any agency action or inaction ... [because it] was not in accordance with this Circular, except as specifically set forth in [the administrative appeal provision]." Circular A–76, ¶¶ 7.a., 7.c.(8). The appeal provision says that each agency "shall establish an administrative appeals procedure to resolve [certain] questions from directly affected parties," who are defined to include "federal employees and their representative organizations," for the purpose of providing "an administrative safeguard to ensure that agency decisions are fair and equitable and in accordance with [certain] procedures [in this Circular]." Circular A–76, ¶ 6.g.; Supplement to Circular A–76, Part I, ch. 2, ¶ I.2. (Aug. 1983). Immediately thereafter the Circular states: "The procedure does not authorize an appeal outside the agency or a judicial review." *Id.* These provisions have been implemented with substantially identical language by the Department of Defense regulations governing procurements. *See* 32 C.F.R. § 169a.18(a) (1986).

The Circular also provides that each agency "shall exert maximum effort to find available positions for adversely affected employees, including ... advising [them] that they have the right of first refusal for employment on the contract in positions for which they are qualified." Supplement to Circular A–76, Part I, ch. 3, ¶ D.2. This provision of the Circular has been implemented by procurement regulations of the Department of Defense that include a first-refusal clause in the terms of its contract solicitation. *See* 32 C.F.R. § 169a.17(d)(4) (1986); 48 C.F.R. § 52.207–3 (1986).

### B.

Although the district court's operative disposal of these claims was for want of standing, the district court on cross-motions for summary judgment found that the undisputed facts supported entry of summary judgment for defendants. Accordingly, this court has a factual record upon which to decide the merits of the Unions' appeal and first-refusal claims. *See, e.g., Sadlowski v. United Steelworkers,* 645 F.2d 1114, 1120 (D.C.Cir.1981).

We need not decide whether the proper standard of review in this case subjects the Unions to the especially heavy burden a disappointed bidder must carry in challenging government procurement decisions, *Kentron Hawaii, Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir.1973), or simply to the routine standard of review under the Administrative Procedure Act, 5 U.S.C. § 706 (1982). Even under the weaker test, the Unions' claims fail.

▮ We hold first that the MSC's denial of a second administrative appeal was reasonable. Although the pertinent regulations (following Circular A–76) state that there "shall" be an "administrative appeal procedure" generally, nothing in those regulations prevents the agency from finding in a particular instance that an appeal would be futile. We, of course, must defer to an agency's interpretation of its own regulations that is not "plainly inconsistent" with their wording. *United States v. Larionoff,* 431 U.S. 864, 872–73, 97 S.Ct. 2150, 2155–56, 53 L.Ed.2d 48 (1977). The appeal regulations permit a challenge to the decision to contract out but not to any distinction between private bidders or to government "management decisions." 32 C.F.R. § 169a.18(a)(1) (1986). The MSC reasonably believed that an appeal of its contracting-out to Lavino would be futile, since neither the government's cost-estimate for continued government operation nor the gap between the government's estimate and the private bidders' proposals had materially changed from the prior solicitation. In addition, the Unions in their role as representatives of the displaced mariners had both the incentive and the opportunity to appeal the original award to Marine Transport. The MSC reasonably denied them a second opportunity to appeal.

▮ We also reject the Unions' claim that the decision not to extend first-refusal rights to displaced temporary mariners was contrary to the applicable regulations. These regulations, and the provision in the

Lavino contract that mirrors them, require that the first-refusal right be granted to displaced government "employees." *See* 32 C.F.R. § 169.a17(d)(4) (1986); 48 C.F.R. § 52.207–3 (1986). We find nothing in this language that requires the right to be extended to temporary employees. The Unions point to language in the Navy's *Handbook on Commercial Activities Program* providing that temporary employees are "eligible" to receive the first-refusal right. But even if we were not again obliged to defer to the MSC's interpretation of its regulations—here its denial that temporary employees must receive the right—language that renders temporary employees "eligible" for the right says nothing about whether the employees are not simply eligible but entitled to the right—indeed, the negative implication of the use of the term "eligible" suggests they are not entitled.

Moreover, MSC's basis for denying the first-refusal right to displaced temporary mariners is reasonable. MSC denied them the right because it feared that, in a tight job market for mariners, they would deprive displaced permanent mariners, the members of MSC's career work-force, of possible positions with Lavino. We see no reason to overturn that determination.

## V.

In summary, although we find that on the facts of this case the Unions would have associational standing for all their claims if their members would have standing, we hold that the Union members lack a causally traceable injury to support the Unions' standing to bring their claim under the Service Contract Act. We assume without deciding that the Unions have standing to bring their appeal and first-refusal claims, and that these two narrow categories of claims are justiciable rather than committed to the MSC's discretion, since we find that each of the claims lacks merit in any event. Accordingly, the district court's entry of summary judgment for defendants in this case is

*Affirmed.*