COALITION FOR THE PRESERVATION OF HISPANIC BROADCASTING, et al, Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION, Respondent,

Univision Holdings, Inc., et al., Intervenors.

Nos. 87–1285, 87–1287, 87–1299, 88–1564, 88–1588 and 88–1596.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 11, 1989.

Decided Jan. 12, 1990.

Opinion on Denial of Rehearing March 23, 1990.

Rehearing En Banc Granted March 27, 1990.

Martin E. Firestone, for Hispanic Broadcasting Systems, Inc., with whom Bruce A. Eisen, for Coalition for the Preservation of Hispanic Broadcasting, and Richard S. Rodin, Washington, D.C., for Susan M. Jaramillo, were on the joint brief for petitioners in Nos. 87–1285, 87–1287, 88–1564, and 88–1596.

Morton L. Berfield, with whom Lewis I. Cohen and Roy W. Boyce, Washington, D.C. were on the brief for petitioner, Hispanic Broadcasting Limited Partnership, in No. 87–1299.

James P. Riley, with whom Robert A. DePont, Washington, D.C., was on the brief for petitioner, TVL Corp., in No. 88–1588.

Sue Ann Preskill, Counsel for the FCC, with whom Diane S. Killory, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, Washington, D.C., and S. Lee Martin, Counsel, FCC, were on the brief for respondent in all cases.

Richard E. Wiley, with whom John C. Quale, Washington, D.C., and Diane Z. Goldman were on the brief for intervenors, Univision Holdings, Inc., et al., in Nos. 87–1285, 87–1287, 87–1299, 88–1564, 88–1588, and 88–1596. James R. Bayles also entered an appearance for Univision Holdings, Inc., et al.

Linda K. Smith and David H. Solomon, Washington, D.C., entered appearances for

intervenor, Station Representatives Ass'n, Inc. in Nos. 87–1285, 87–1287, 87–1299.

L. Andrew Tollin and Leon T. Knauer, Washington, D.C., entered appearances for intervenor, Seven Hills Television Co., in Nos. 87–1285, 87–1287, 87–1299, and 88–1564.

N. Frank Wiggins, Washington, D.C., entered an appearance for intervenor, Fouce Amusement Enterprise, Inc., in Nos. 87–1285, 87–1287, 87–1299.

John L. Tierney, Richard F. Swift and Ann Bavender, Washington, D.C., entered appearances for intervenor, Bahia de San Francisco Television Co., in Nos. 87–1287 and 87–1299.

Before MIKVA, EDWARDS and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

Opinion filed by Circuit Judge WILLIAMS, dissenting in part and concurring in part of the judgment.

MIKVA, Circuit Judge:

In these consolidated cases, three companies comprised of Hispanic investors, an association claiming concern with preserving Hispanic broadcasting, and an Hispanic individual petition this court for judicial review of two orders of the Federal Communications Commission ("FCC" or "Commission"). The first order approved a settlement agreement providing for the grant of license renewal applications for Spanish International Communications Corporation ("SICC") and Bahia De San Francisco ("Bahia") subject to the prompt transfer of the licenses to a holding company controlled by Hallmark Cards, Inc. ("Hallmark"). The first order also denied petitions for acceptance of competing applications for the SICC and Bahia stations by two of the companies bringing petitions in this case. *See Spanish International Communications Corporation*, 2 FCC Rcd. 3336

(1987). The second order granted applications to transfer control of the licenses to Hallmark and denied applications which sought to block the transfer. *See Spanish International Communications Corporation*, 3 FCC Rcd 4319 (1988).

The settlement agreement was approved after an ALJ determined that the stations in question were subject to the *de facto* control of an alien in violation of § 310(b)(3) of the Communications Act of 1934, 47 U.S.C. § 310(b)(3) (1982). The principal question presented is whether the Commission's approval of a full market value sale to Hallmark prior to the final resolution of the renewal proceedings contravenes the Commission's policy forbidding assignment at full value of broadcast stations by a licensee, whose qualifications are under investigation, until the Commission has determined that the licensee has not forfeited its broadcast authorization. *See Jefferson Radio Company v. FCC*, 340 F.2d 781, 783 (D.C.Cir.1964). If indeed the Commission has changed its *Jefferson Radio* policy, we must determine whether it has explained adequately its departure from existing policy. We affirm the Commission's rulings declining to accept the competing applications and declining to review the actions of another federal court in administering a bidding process that led to the selection of Hallmark as the transferee. However, we hold: (1) that the three companies, as prospective competitors for the licenses, have standing to challenge the Commission's approval of the settlement and transfer; and (2) that the Commission departed from the policy upheld in *Jefferson Radio*. Because this case does not fall within any of the established exceptions to *Jefferson Radio*, we remand this case to the Commission to complete the renewal proceedings that were pending at the time the transfer was approved or to enunciate and explain a new policy that would modify *Jefferson Radio*.

I

A. *Statutory Background*

Section 310(b) of the Communications Act precludes the Commission from grant-

ing a broadcast license to foreign nationals or their representatives or to foreign corporations. 47 U.S.C. § 310(b)(1), (2). In addition, under the provision at issue in this case, "[n]o broadcast ... license shall be granted to or held by [a United States corporation] of which any officer or director is an alien or of which more than one-fifth of the capital stock is owned ... or voted by aliens or their representatives." 47 U.S.C. § 310(b)(3). Congress' motivation in passing this restriction was based primarily " 'upon the idea of preventing alien activities against the Government during the time of war.' " *Noe v. FCC*, 260 F.2d 739, 741 (D.C.Cir.), *cert. denied*, 359 U.S. 924, 79 S.Ct. 607, 3 L.Ed.2d 627 (1959) (quoting 68 Cong.Rec. 3037 (1927)).

### B. *Procedural History*

#### 1. *Proceeding before the ALJ*

SICC and Bahia (collectively, "SICC") were the licensees of six television stations broadcasting in the Spanish language. A seventh Spanish language station was licensed to the Seven Hills Television Company, which was controlled by many but not all of the principals who controlled SICC. SICC's corporate predecessors began acquiring broadcast stations in 1961. Prior to initiating in 1983 the renewal hearing at issue in this case, the Commission, with knowledge of the relationships giving rise to the hearing, unconditionally granted various applications by SICC to acquire stations and repeatedly renewed SICC's broadcast licenses. After a staff investigation precipitated by an outside complaint, the Commission designated for hearing the renewal applications for each SICC station. The principal issue was whether the corporate licensees of the stations were controlled by aliens or their representatives in violation of Section 310(b) of the Act. After a full evidentiary hearing, the ALJ found that SICC had violated § 310(b)(3) because Reynald V. Anselmo, president and a director of SICC, had acted as the representative of the Azcarraga family,

Mexican citizens and owners of a Mexican media empire. *Spanish International Communications Corporation*, FCC 86D-1, *Initial Decision* at ¶ 176 (January 8, 1986). While the Azcarragas' stock holdings in SICC did not exceed the 20% statutory limitation, the ALJ concluded that the family's financial and personal relationships with American principals of SICC, particularly Anselmo, gave the family a degree of influence and control over the SICC stations which "greatly exceeded that permitted by Section 310(b)."

According to the ALJ this influence manifested itself at several levels. The composition and ownership of the board of directors of licensee corporations were affected by the Azcarragas' financing of stock purchases for selected principals. For example, Anselmo, a former employee in the Azcarragas' media empire, purchased interests in SICC stations with Azcarraga financing. As president and a director of all of the licensee companies, Anselmo personally selected all station managers. In addition, a major portion of programs broadcast by SICC stations originated from Televisa, a Mexican production company in which the Azcarragas had a controlling interest. The ALJ regarded Anselmo as the chief conduit of the Azcarragas' influence and as a "representative of aliens" within § 310(b)(3). These facts, coupled with the "historic financial and personal ties between [l]icensees and the Azcarraga family," resulted in "an abnormal relationship ... whereby the [SICC] stations were dependent on foreign subsidiaries" for financing, programming and management. Thus the ALJ denied the renewal applications. He invited the parties, however, to seek "a less drastic remedial solution, such as a corporate restructuring" by raising the matter in an application for review of his decision.

#### 2. *The Settlement Agreement*

The licensees appealed the ALJ's decision to the Commission's Review Board and several third parties filed exceptions to the

ALJ decision. The exceptions challenged: (1) the ALJ's refusal to consider whether SICC abused the Commission's processes by filing lawsuits against Spanish Radio Broadcasters of America ("SRBA") (one of the excepting parties) and other potential witnesses in the proceeding against SICC; and (2) the ALJ's refusal to consider whether there was misconduct or misrepresentation sufficient to violate the Commission's policy on character qualifications.

While the exceptions were pending before the Board, SICC submitted a proposed settlement agreement whereby the SICC licenses would be renewed for the limited purpose of promptly transferring the stations to an unrelated, qualified buyer. SICC proposed to sell the stations to Hallmark, an American corporation having no ties to the Azcarragas. The selection of Hallmark arose from the settlement of an unrelated, ongoing stockholders' derivative suit brought against SICC, *Fouce Amusement Enterprises, Inc. v. Spanish International Communications Corp.*, No. CV 76–3451–MRP (C.D.Cal.). After SICC agreed to settle the stockholders' suit by selling the stations, the federal district court for the Central District of California supervised bidding for the stations and ultimately accepted Hallmark's bid.

The Commission's Review Board approved the proposed settlement without ruling on the merits of the exceptions. On review, the Commission agreed with the Review Board that the proposed assignment of SICC licenses was in the public interest notwithstanding its general policy under *Jefferson Radio*. The Commission reasoned that under the circumstances of the case, the proposed sale would "not unacceptably diminish" the deterrence of licensee wrongdoing—the rationale undergirding *Jefferson Radio*. *Spanish International Communications Corporation*, 2 FCC Rcd. 3336, 3338–39 (1987). The Commission deemed the settlement in the public interest because: the "technical" nature of the violations found by the ALJ suggested that SICC had no intention of violating the statute or deceiving the Commission; and by providing for the removal of SICC as licensees, the settlement constituted an effective means to implement prospectively the statutory policy against alien control. Noting that SICC and its predecessor had been allowed to broadcast for the past twenty-five years and citing the "unique contributions" that these stations made to broadcasting in this period, the Commission concluded that this was an appropriate case in which SICC should be removed from broadcasting, but without the harshness attending an outright denial of its renewal applications. The Commission also found that the settlement agreement served the public interest by simplifying a complex case, saving administrative costs, removing a "cloud" of uncertainty that can adversely affect a station's performance, and facilitating the resolution of the *Fouce* stockholder's derivative suit and the antitrust litigation directed at SRBA. Prior to this decision, SRBA withdrew its exceptions to the ALJ decision and filed a petition in support of the SICC settlement agreement, noting that SRBA and SICC were "executing an agreement that is intended to result in settlement as among themselves of the Antitrust Litigation." At no stage of these proceedings did the Commission rule on the merits of the exceptions.

Subsequently, the FCC considered Hallmark's qualifications and approved the applications to transfer the stations to Hallmark.

### 3. *Challenges Below by Petitioners*

The Hispanic Broadcasting Limited Partnership ("HBLP") filed a petition for review of the Review Board's approval of the settlement agreement along with an application for acceptance of its competing license applications. The Commission denied both requests. Regarding the competing applications, the Commission concluded that because HBLP failed to file in accordance with Commission time limits the applications properly were rejected. The Commission declined to waive its cut-off rule "absent a compelling justification" which it did not find.

Hispanic Broadcasting Systems, Inc. ("HBS") also petitioned below for accept-

ance of competing applications. Although the Commission denied this petition, HBS does not challenge that ruling before this court. The Coalition for the Preservation of Hispanic Broadcasting ("the Coalition"), HBS, and Susan M. Jaramillo submitted a consolidated petition for review in this case. Each party petitioned below for denial of the application to transfer SICC stations to Hallmark. These petitions also were denied.

TVL Corporation, comprised of Hispanic investors and one of the two finalists in the shareholder derivative settlement process, petitioned the Review Board to deny applications to transfer SICC's licenses to Hallmark. In its petition TVL argued that the transfers should be denied without prejudice and that an order should be issued by the Commission directing SICC to request the Ninth Circuit, which had jurisdiction over the SICC stockholders derivative suit, to remand that litigation with instructions: (1) to vacate its selection of Hallmark as the prevailing bidder; and (2) to consider the final bids of Hallmark and TVL as of July 23, 1986.

TVL argued that the bidding process discriminated against minority-controlled entities seeking to purchase SICC. By requiring bidders to sign a confidentiality agreement precluding signers from seeking to acquire SICC by means other than the market value bidding process, TVL asserts that minority parties contemplating a "distress sale" were discriminated against. Pursuant to the *Jefferson Radio* policy of prohibiting a licensee facing qualification issues in a renewal hearing from profiting on the sale of broadcast interests, TVL believed it was highly unlikely that a full market sale would be allowed. When TVL learned that the Commission's Mass Media Bureau had acceded to the "full value" sale, TVL quickly gathered the financing for a full value bid, timely filed its bid, and was selected as a second round bidder. On July 18, 1986 the TVL and Hallmark bids were submitted to the district court as the two finalists. Evidence of the final TVL financing commitments was not yet available when the bids were placed before the court, although TVL had advised SICC that it would be available as it ultimately was on July 23, 1986. The court entered an order conditionally approving the Hallmark bid on July

18, 1986. TVL then filed a motion to intervene in the shareholder suit and Hallmark moved for an affirmance of the order entered on July 18. The district court rejected TVL's motion to intervene and approved Hallmark on several grounds, one of which was that Hallmark had unequivocal financial backing. The Ninth Circuit affirmed the denial of the motion to intervene without comment on the merits of TVL's claims. *Fouce Amusement Enterprises, Inc. v. Spanish International Communications Corp.*, 819 F.2d 1145 (9th Cir.) (table), *cert. denied sub nom. TVL Corp. v. Spanish International Communications Corp.*, 484 U.S. 1028, 108 S.Ct. 754, 98 L.Ed.2d 766 (1988).

TVL argued that the settlement agreement between SICC and the Bureau lacked appropriate measures to protect adequately potential minority purchasers who had previously been pursuing the possibility of a "distress sale" acquisition. The Commission rejected this claim, reasoning, *inter alia*, that the relief requested would be "entirely inappropriate and at variance with the Commission's long-standing policy of declining to adjudicate matters properly pending in another forum." *Spanish International Communications Corporation*, 3 FCC Rcd 4319, 4320 (1988).

## II

### A. *Standing*

The Commission concedes that petitioner HBLP has standing to challenge the Commission's dismissal of its competing applications. The Commission argues, however, that if this court upholds the dismissal of the competing applications, then HBLP does not have standing to challenge the settlement agreement or the transfer of SICC stations to Hallmark. In addition, the Commission argues that all other petitioners lack standing to bring their respective claims. We find that the three companies have standing; therefore we need not resolve the question of whether the Coalition or Ms. Jaramillo can claim standing as viewers.

The law of standing is based on a set of constitutional and prudential requirements.

To establish standing under article III of the Constitution a litigant must plead an injury in fact fairly traceable to the conduct complained of and likely to be redressed by the relief requested. *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Under statutory and prudential standing requirements, standing to challenge an order of the Commission is conferred by § 402 of the Communications Act, which allows appeal to this court by "any ... person who is aggrieved or whose interests are adversely affected" by such order. 47 U.S.C. § 402(b)(6) (1982).

### 1. *Standing as Viewers*

In their consolidated brief, the Coalition, HBS and Susan M. Jaramillo (collectively, "Consolidated Petitioners") claim standing as viewers under *Office of Communication of the United Church of Christ v. FCC,* which allows responsible representatives of the broadcast audience to assist the Commission in vindicating the public interest. 359 F.2d 994, 1004–05 (D.C.Cir.1966). Consolidated Petitioners suggest that the settlement threatens the public's interest in the continuation of Spanish language programming. Their claim of standing is problematic because there is no evidence to suggest that the anti-alien control provisions of the Act were implemented to advance the public's interest in programming content. We need not resolve this issue, however, because we find that HBLP, HBS, and TVL have standing as prospective competitors to challenge the Commission's approval of the settlement agreement. Since the relief sought by those petitioners encompasses the relief sought by the other Consolidated Petitioners, it is of no moment whether "viewer" standing exists in this case.

### 2. *Standing as Prospective Competitors*

█ As a threshold matter we must address the nature of the action brought by petitioner TVL. TVL does not challenge the settlement agreement *per se* but the process which led to the selection of Hallmark as the transferee. It asks us to reverse the Commission's approval of the settlement agreement on the grounds that the Commission failed to address its claim that the bidding process was discriminatory. This cause of action is not reviewable in this court, however, because it essentially seeks a review of the judicial proceedings which occurred in the Ninth Circuit. Neither the Commission nor this court can engage in such review.

The Commission argues that, assuming we uphold its denial of the competing applications, none of the petitioners have standing as prospective competitors for the SICC licenses. It conceded at oral argument that if a reversal of its orders would result in vacant licenses, companies eligible to file applications for those licenses would have standing to challenge the Commission's order. *See, e.g., MG–TV Broadcasting v. FCC,* 408 F.2d 1257, 1264 n. 24 (D.C.Cir. 1968) (prospective applicant had standing to challenge assignment of a construction permit where denial of the application would have left the station vacant and available for other applications). The Commission argued, however, that *MG–TV* is limited to cases where the license could become available directly as a result of the court's order. We reject this distinction.

While *MG–TV* involved a substantive challenge which, if accepted, immediately would have rendered the relevant license open to competition, the rationale for prospective competitor standing does not require that we restrict it to such circumstances. This court recently allowed a would-be competitor for a license to challenge an FCC order granting the incumbent licensee permission to sell its broadcast properties to a minority-controlled enterprise pursuant to the Commission's distress sale policy. *See Shurberg Broadcasting of Hartford, Inc. v. FCC,* 876 F.2d 902 (D.C.Cir.1989). There, similar to this case, the Commission's order sanctioned a sale that would have avoided a renewal hearing. Yet the *Shurberg* court's ruling that the distress sale policy was unconstitutional did not create a vacant frequency but reverted the incumbent licensee to its prior designated-for-hearing status. Apparently the FCC did not contest Shurberg's standing in that case. *See id.* at 906–07. While the *Shurberg* court did not address the issue of standing explicitly, this result is consistent with the general principle under-

lying standing for frustrated competitors. *Cf. National Maritime Union of America v. Commander, Military Sealift Command,* 824 F.2d 1228, 1237–38 (D.C.Cir. 1987) ("[I]njury to a bidder's right to a fair procurement is obviously an injury both traceable to the alleged illegality in a procurement and redressable by any remedy that eliminates the alleged illegality.").

By analogy, HBLP and HBS claim an injury to their right to a fair license award process both traceable to the Commission's wrongful conduct in approving the transfer to Hallmark and redressable by our remedy which eliminates that conduct, i.e., remand for continuance of the qualification hearing or articulation of a new policy. Similarly, TVL claims a "fair procedure" injury traceable to the Commission's approval of the transfer and redressable, if we were willing to review the merits, by reopening the settlement to permit a reopening of the bidding process. HBLP, HBS, and TVL have all made unsuccessful attempts to become the licensee for the stations at issue in this dispute. While there is no certainty that this opportunity will be regained upon remand, that possibility is far from remote. Moreover these parties were entitled to expect that a proceeding which was insulating the licenses from competition until its conclusion would not be truncated by an illegal transfer of the licenses to a third party. We therefore find a redressable injury, meeting the constitutional requirements for standing to challenge the Commission's approval of the settlement and transfer.

We disagree with the dissent's suggestion that HBLP and HBS should not be afforded article III standing because they were not within "the zone of active consideration" for the licenses in question. As the dissent correctly notes, this "active consideration" requirement has been imposed as a condition for standing to challenge government contract awards. *See National Maritime Union,* 824 F.2d at 1237–38 n. 12. But to export this reasoning wholesale to the license renewal context ignores critical differences between the license renewal and contract bidding processes. In the classic disappointed bidder case, all potential parties started with a level playing field whereby each applicant brought its resources to bear in vying for a "vacant" contract. In contrast, the typical "frustrat-

ed competitor" for an FCC license has had to vie with the *incumbent* licensee (as well as other competitors) in a process which obviously creates institutional biases toward the incumbent. It is not an "open" bidding contest *per se.* More importantly, once an incumbent's qualifications have been designated for hearing, as was the case here, the incumbent is insulated from competition. For example, HBLP timely filed a competing application for SICC's Miami station license at a time when SICC's renewal application for that license was in hearing on the issue of alien control. Although we hold below that the FCC correctly declined to accept this application during the pendency of the hearing, this fact illustrates the inappropriateness of the "active consideration" requirement in the FCC licensing context. The dissent's suggestion that SICC somehow was rendered vulnerable once its qualifications were challenged, opening the door to free and fair competition, could not be further from the actual circumstances of this case. Once SICC's qualifications were in hearing all possibility of competition for the licenses was precluded until the Commission finally resolved the hearing.

The bidding process administered in the Ninth Circuit as a remedy for the shareholder derivative suit can hardly be viewed as an exclusive (or even appropriate) place for applicants to demonstrate their "standing" in the licensing dispute. It was not an official FCC forum for competing for the licenses; indeed FCC policy appeared to prohibit the consummation of any transfer until the conclusion of the hearing. The dissent proceeds to argue that once the FCC decided to truncate the hearing process with the Hallmark settlement, HBS and HBLP could have demonstrated the seriousness of their commitment to obtaining the licenses by at least petitioning to intervene in that proceeding. But this action, too, would not have enabled these companies to gain the FCC's "active consideration" of their own applications.

Such arguments illustrate how the dissent misconstrues the standing inquiry. Standing does not amount to some kind of largesse dispensed at the discretion of article III judges. This circuit has never explicitly imposed a requirement that a "frustrated competitor" for an FCC license demonstrate its prospects for succeeding in the

license award process. In *Orange Park Florida T.V., Inc. v. FCC,* on which the dissent heavily relies, this court stated that "contingencies may arise" which could cause the petitioner to "decide not to reapply" or could "defeat its [renewed] application." 811 F.2d 664, 673 n. 18 (D.C.Cir. 1987). The *Orange Park* court further stated that it could discern no " 'absolute barriers' " to the petitioner's competing for the license in the future—the outer limit imposed by this court in determining whether an injury is redressable by the relief the petitioner seeks. *Id.* (quoting *Greater Tampa Chamber of Commerce v. Goldschmidt,* 627 F.2d 258, 264–65 (D.C. Cir.1980)). It was in this redressability context that the *Orange Park* court noted that the petitioner had "devised plans sufficiently detailed to enable it to compete for the facility." 811 F.2d at 673 n. 18. While a would-be competitor certainly could simplify the reviewing court's standing analysis by providing such detail, this statement does not constitute a legal requirement for standing under the law of this circuit. The dissent also cites *Public Citizen v. Lockheed Aircraft Corp.,* 565 F.2d 708 (D.C.Cir. 1977), for the proposition that a would-be competitor lacks standing where it fails to demonstrate its capacity to compete in the future. In that case, however, members of a trade association of machinery dealers sought to challenge a sale by the federal government of a manufacturing plant to the Lockheed Corporation. Because none of the members of the association, which were in the business of machinery sales and not defense contracting, had displayed a realistic intent to purchase an entire plant, the foundation for standing was deemed too speculative. *Id.* at 717–19. In contrast, the three companies at issue in this case have actually attempted in the past to bid or compete for the licenses in question.

Equally insupportable is the dissent's attempt to relegate this court's standing ruling in *MG–TV Broadcasting* to the status of a "superseded" case. Despite its appearance in a footnote, until the case is overruled or limited, the *MG–TV* court's reasoning on standing has the force of precedent.

The three companies also satisfy the statutory and prudential requirements for standing. Frustrated license applicants are parties "aggrieved" within the meaning of § 402(b)(6) of the Communications Act because they have a "concrete, economic interest that has been perceptibly damaged by the Commission's award [of licenses to another competitor.]" *See Orange Park,* 811 F.2d at 673. Having disposed of TVL's claim, we turn then to the substance of the complaints made by HBLP and HBS.

## B. *Competing Applications*

Petitioner HBLP presents a threefold argument as to why its competing applications should have been accepted by the Commission at the time the SICC settlement agreement came up for review before the Commission. HBLP reasons: (1) that its application for SICC's Miami facility (WLTV) should have been accepted as a matter of right without the need for a waiver of the cutoff rule; (2) that its application for SICC's San Antonio facility (KWEX–TV) should have been accepted because, due to confusion in the Commission's notices, no valid cut-off date was established; and (3) that the remaining HBLP applications should have been accepted pursuant to a waiver of the cutoff rule because the Commission has not applied its "compelling justification" policy consistently in the past. We reject each of these arguments.

### 1. *The Miami Application*

■ HBLP invites this court to address a question left open in a previous case, *Committee for Open Media v. FCC,* 543 F.2d 861, 872–73 (D.C.Cir.1976): whether the Commission properly can reject an otherwise timely competing application because of the pendency of a *non-comparative* renewal hearing. The "window" was open for filing competing applications in the state of Florida at the time SICC's WLTV renewal application was in hearing on the issue of alien control. But because HBLP's application was mutually exclusive with SICC's, the Commission barred HBLP from filing its application. HBLP argues that the Commission's *Ashbacker* doctrine favoring comparative hearings in broadcast licensing decisions, *Ashbacker Radio Corp. v. FCC,* 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945), compels acceptance of its com-

peting application. The Commission replies that its longstanding policy against accepting competing applications when qualification issues are under active prosecution is a necessary means for achieving administrative finality. In *Shurberg,* Judge Silberman spoke with approval of this policy rationale, reasoning that designated-for-hearing applications should be protected from competitive filings so long as the FCC is engaged in ongoing administrative activity. *See Shurberg,* 876 F.2d at 908–09.

We conclude that the Commission acted within its discretion in barring HBLP's competing application for WLTV. While we are not unsympathetic to the argument that an extended qualifications proceeding inadvertently benefits the licensee by insulating it from competition, the circumstances of the case *sub judice* do not give rise to public interest concerns which outweigh the public's interest in administrative finality and efficiency. In *New South Media Corp. v. FCC,* this court held that "with no renewal hearing ongoing ..., no evidence-taking underway, [and] no proceeding in midstream or even launched," the Commission erred in barring competing applications because doing so would not "require reopening of 'matters once decided,' or 're-litigation' of issues already aired." 685 F.2d 708, 716 (D.C.Cir.1982) (citation omitted). In reaching this decision, the *New South* court relied on a case in which the Commission ruled that competing applications should be entertained where prosecution of a renewal application had been deferred for three years. *Id.* (citing *Carlisle Broadcasting Associates,* 59 FCC2d 885, 885 n. 1, 889 n. 16 (1976)). In contrast, the *New South* court suggested that if a renewal application were actually "in hearing throughout most of the license term and past its expiration," competing applications should not be allowed until conclusion of the proceeding. *Id.* (distinguishing *Committee for Open Media,* 543 F.2d 861).

The two other cases relied upon by HBLP are unavailing. In *La Rose v. FCC,* 494 F.2d 1145 (D.C.Cir.1974), a renewal hearing was reopened in order to protect innocent creditors by enabling a court-appointed receiver to pursue an opportunity to sell the station in question. In *MG–TV Broadcasting Company v. FCC,* this court held that the Commission erred in extending a construction permit where the holder

of the permit had made no significant progress toward construction and lacked good faith. Instead, a comparative hearing was required. 408 F.2d 1257 (D.C.Cir. 1968). Unlike the cases discussed thus far, HBLP's argument offers no countervailing interest, other than the public's broad interest in competition, for opening an ongoing qualifications hearing to competing applications. Moreover, HBLP does not offer any specific evidence to support its claim that its application would only marginally extend the renewal proceeding. Yet, a qualifications hearing might extend into the next license period if competing applications dictated the "reopening of the hearing record for cross-examination of previous witnesses, objection to exhibits already admitted, introduction of new evidence, and retrial of issues." *Committee for Open Media,* 543 F.2d at 873. In light of these considerations, the Commission did not abuse its discretion in refusing to accept HBLP's application for the WLTV facility.

## 2. *The San Antonio Application*

■ HBLP claims that no valid cutoff date was established for applications competing for one of SICC's licenses—that of KWEX–TV. It argues that the Commission failed to follow proper procedure in alerting potential applicants that the filing period for competing applications would not be truncated by its order designating for hearing SICC's KWEX–TV renewal application. HBLP effectively concedes that the Commission's official notice in the Federal Register was accurate. Petitioner argues, however, that the Commission erred in issuing a news release, prior to the official notice, which announced the designation for hearing without noting that the normal window for competing applications would be maintained. In its order below, the Commission rejected this claim because HBLP failed to demonstrate that it or any other applicants were actually confused or deterred by the news release; alternatively the Commission relied on its official notice.

We affirm the Commission's ruling because: (1) HBLP did not attempt to file a competing application at the relevant time and no prejudice has been demonstrated to any other applicants; *cf. Salzer v. FCC,* 778 F.2d 869, 875 (D.C.Cir.1985) (filing in-

structions were vague and ambiguous and 44 of 53 applicants apparently were misled by them); and (2) the official notice was accurate and was released before the close of the window.

### 3. *Denial of Waivers*

■ HBLP asserts that the Commission erred in denying waivers of its cutoff rule for its remaining competing applications (and for the Miami and San Antonio applications in light of the failure of the above claims). It argues that the Commission has not applied its "compelling justification" basis for waivers consistently in the past and reasons that the lack of an established "strict" waiver policy impels the Commission to grant waivers in the case *sub judice.* We find this argument without merit.

The FCC precedents relied upon by HBLP upheld waivers based upon persuasive showings of impossibility, hardship, or other arguments demonstrating a clear public interest in allowing the waiver. HBLP has not identified any Commission precedent similar to this case where applicants seek waivers as much as three years after the cutoff date and offer only the public's interest in competition as a justification for the waiver. Moreover, HBLP has not offered any explanation as to why, with the exception of the Miami application, the competing applications were not timely filed. We affirm the Commission's ruling because it has offered a reasonable distinction between this case and occasions in the past when waivers of filing deadlines have been granted.

### C. *Deviation from* Jefferson Radio

■ As a threshold matter petitioner HBLP argues that by approving the settlement agreement the Commission violated §§ 301 and 304 of the Act, which preclude property rights in broadcast licenses. Similarly, HBS argues that § 310(b) absolutely precluded the Commission from granting a license to SICC for any purpose after the ALJ's finding of *de facto* alien control. We need not resolve these questions, however, because we find that the Commission vio-lated its policy as upheld in *Jefferson Radio.* HBLP also argues that the Commission, pursuant to § 309 of the Act, should have provided notice and an opportunity for public participation prior to consideration of the settlement because the settlement raised issues of substantial public concern. We reject this argument. Nothing in § 309 requires the Commission to solicit public comment on settlement agreements in adjudicatory proceedings. *See* 47 U.S.C. § 309 (1982). On the contrary, the Act limits the right of petition to deny an application to a "party in interest." 47 U.S.C. § 309(d)(1).

Petitioner HBLP charges that by approving a full market sale to Hallmark prior to the conclusion of the renewal proceeding, the Commission made an *ad hoc* exception to the policy upheld in *Jefferson Radio* without articulating a clear rationale for this departure. We agree.

The content and rationale of the *Jefferson Radio* policy are adequately explained in a previous opinion of this court:

> Under a long-standing policy formulated by the [Commission] and upheld by this court, *Jefferson Radio Co. v. FCC*, 340 F.2d 781, 783 (D.C.Cir.1964), radio station licensees whose licenses have been designated for revocation hearing, or whose renewal applications have been designated for hearing on basic qualification issues, are forbidden to transfer control of these licenses. Established on the premise that "a licensee … has nothing to assign or transfer unless and until he has established his own qualifications," *Northland Television, Inc.,* 42 Rad. Reg.2d 1107, 1110 (1978), the policy stems from the Commission's concern for the continued effectiveness of the deterrent provided by, in the appellant's words, the "awesome potential for economic loss that attends deprivation of license."

*Stereo Broadcasters, Inc. v. FCC,* 652 F.2d 1026 (D.C.Cir.1981). As the Commission has observed:

> [W]here an evidentiary hearing has been designated on a renewal application or show cause order to determine disqualification questions, permitting the suspect-

ed wrongdoer to evade sanction by transferring his interest or assigning the license without hearing will diminish the deterrent effect which revocation or renewal proceedings should have on broadcast licensees. *Only under exceptional circumstances giving rise to compelling equitable considerations will the Commission grant renewal to such an applicant and authorize a concomitant license assignment or transfer of control.... Additionally the assignor must show he will derive no unwarranted [financial] benefit from a grant of renewal ... conditioned upon the proposed transfer or assignment.*

*Northland Television,* 42 Rad.Reg.2d at 1110 (emphasis added).

The Commission has found compelling equitable circumstances in cases where the assignor is disabled or where the licensee's assets are held by a receiver in bankruptcy for the benefit of innocent creditors. *Id.* at 1110 n. 4. In those rare cases where the Commission, prior to final resolution of a renewal hearing, has approved transfers falling outside these recognized exceptions, the transfer was made with a substantial monetary penalty to the transferor. *See, e.g., RKO General, Inc. (KHJ–TV),* 3 FCC Rcd 5057, 5062 (1988) (assignor to get $105 million less than purchase price and settlement would avoid years of further litigation); A.S.D. *Answering Service Inc.,* 1 FCC Rcd 753, 754 (1986) (surrender of a construction permit and three licenses and dismissal of all low band licensing application plus firing of all employees whose conduct was at issue); *George E. Cameron Jr. Communications,* 56 Rad.Reg.2d 825, 828 (1984) (transferee assumed $6.5 million in debt, relinquished rights in another station, and returned a silent, failed station to the air and transferors received no compensation whatsoever).

The Commission presents three arguments in support of its claim that its actions are consistent with *Jefferson Radio.* First, it argues that the policy prohibits transfers only when the potential benefits in the proposed assignment are outweighed by a countervailing and overriding public interest in the Commission retaining effective control over the conduct of its licensees. The Commission's reliance on *North-western Indiana Broadcasting Corp.,* 60 FCC2d 205 (1976), as precedent for this balancing approach, however, is misplaced. In *Northwestern,* the Commission declined to accept a settlement proposal which would have avoided a lengthy qualification hearing by transferring the station to a third party. The Commission reached this conclusion even though the proposed transfer was approved by the party which precipitated the qualification hearing and would have given a majority black community its first black radio station. *Id.* at 209–10. The Commission invoked balancing language to explain the deterrence rationale underlying *Jefferson Radio,* reasoning that *despite* its potential benefits, the settlement was precluded by the "countervailing and overriding public interest" in maintaining the deterrence function of its hearing processes. Rather than establishing a balancing test, the Commission in *Northwestern* unequivocally adhered to *Jefferson Radio,* precluding the settlement because it did not fall within established exceptions. *Id.* at 210–11.

The dissent suggests that this court has constructed *Jefferson Radio* as some kind of rigid doctrine to frustrate the Commission's desire to distribute justice in its licensing process. We take the doctrine as the Commission established it. Obviously the Commission is free to change the doctrine, as long as it explains why and what it is doing, and complies with its process requirements.

Thus the Commission's argument that it properly weighed the factors favoring approval of the settlement agreement against its interest in deterrence is without merit. Equally unavailing is the Commission's second argument that there are no guiding precedents in this case because it involves subjective inferences of *de facto* control under § 310(b) and because SICC was an incumbent licensee of 20 years. The Commission reasons that the "illusive nature" of *de facto* control counsels against a harsh remedy in the absence of specific precedent to guide a licensee. The authority upon which the Commission relies, however, does not support this contention. This court in *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 861 (D.C.Cir.), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971), upheld the Commission's decision to

impose a remedy having a harsh effect even though there was not an explicit precedent giving notice to the licensee that it was required to report a change in *de facto* control. The *Greater Boston* court did state that use of a sweeping rather than a more refined administrative remedy may in some instances represent an improvident use of administrative discretion. *Id.* It did not, however, provide examples of such instances and its holding counsels against the position which the Commission asserts in this case.

Third, the Commission attempts to use the fact that this case involves *de facto* control to distinguish it from precedents requiring sales in exception to *Jefferson Radio* to be made at diminished value. The Commission argues that the misconduct at issue in those cases was more egregious than in this case because: (1) with no alien having exceeded the 20% stock ownership limitation or having served as an officer or director, SICC complied with the two statutory benchmarks for *de jure* control; and (2) SICC made no attempt to conceal the relationships at issue nor did its conduct involve any misrepresentations or character violations. Offsetting the allegedly "technical" misconduct against, *inter alia,* the "unique" contributions of SICC to broadcasting and the administrative convenience of the settlement, the Commission concluded that the equities of the case distinguished it from other cases warranting harsher treatment.

This distinction is specious for two reasons. First, none of the "diminished value" cases turn on the egregiousness of the conduct in question. As described above, all of these cases are premised on a clear requirement that exceptions to *Jefferson Radio* falling outside the established categories of insolvency or disability be made only at substantial monetary cost to the assignor. Even under the established exceptions the Commission has required adequate showings not only of compelling equitable circumstances but also of reduced financial benefit for the assignor. *See Northland Television,* 42 Rad.Reg.2d 1107 (licensee had to make adequate showing that its principal suffered disability and that the proposed transfer would not result in a profit to the assignor).

Second, SICC's conduct is not rendered less serious simply because the ALJ found that the violation involved *de facto* control. Clearly, the complex pattern of interlocking relationships scrutinized by the ALJ were developed for the precise purpose of avoiding the *de jure* restrictions in § 310(b). The ALJ's extensive findings demonstrate that conduits for alien influence can be created that have the potential to be just as effective as *de jure* violations. For example, in the early days of SICC's tenure as a broadcaster, the Azcarragas advanced emergency funds to the stations, provided programming to the stations while deferring payment for years, and opened collateral deposit accounts for the stations to draw upon in order for the stations to receive financing from United States banks. In addition, a number of the officers and directors of the SICC stations had significant pre-existing associations with the Azcarraga media empire and became principal investors in various licensee stations with the benefit of Azcarraga financing. *Initial Decision* at ¶¶ 80–114. While we reach no conclusions as to whether such conduct constitutes a violation of § 310(b), we are unpersuaded that the distinction between *de jure* and *de facto* conduct has any relevance for the purposes of maintaining the deterrence rationale which informs the *Jefferson Radio* policy.

The abuse-of-process allegations raised in the exceptions to the ALJ's decision also undercut the Commission's assertion that SICC's conduct was distinguishable from that addressed in the other diminished value cases. The Commission's own Mass Media Bureau attempted to add an abuse-of-process issue to the hearing before the ALJ—a petition which the ALJ denied. The Bureau then filed an exception which charged that SICC harassed and intimidated SRBA and other potential witnesses for having brought information about SICC's conduct to the attention of the Commission. For example, SRBA alleged that SICC filed more than thirteen apparently baseless antitrust suits against potential witnesses to chill adverse petitioning before the Commission. The Commission asserts that because SRBA withdrew its exception—pursuant to a settlement of the antitrust litigation brought by SICC against SRBA and associated parties—it did not feel com-

pelled to investigate this claim. The terms of SRBA's settlement with SICC are not in the record; hence we do not know what induced SRBA to withdraw the abuse-of-process claim and to file a petition in support of the transfer to Hallmark. Certainly, if SICC intended to "buy" its way out of the abuse-of-process charges, the Commission ought not to facilitate such a result by not investigating the charges. While we are not suggesting that the Commission is obliged to reopen the abuse-of-process claims, these circumstances further persuade us that this was not a case of mere "technical" allegations sufficient to escape the requirements of *Jefferson Radio.*

Finally, the Commission urges a "remedy" for a possible violation of § 310(b), prior to the final resolution of the issue, which is an extreme departure from prior precedents: a full market sale at $300 million with no apparent burdens to SICC other than barring SICC principals from becoming officers or directors of the assignee for two years. Intervenors, indirect subsidiaries of Hallmark, point out that in the past the Commission has ratified unauthorized transfers of control by approving a subsequent application to transfer while exacting only a $10,000 fine against the incumbent licensee. *See Bartell Broadcasters, Inc.,* 19 FCC2d 890 (1969); *Areawide Communications, Inc.,* 12 FCC2d 170 (1968). Yet in neither of these cases had the qualifications or renewal application of the incumbent licensees been designated for hearing *prior* to the request for official authorization of the transfers. Moreover, in both cases the Commission made a final determination that there had been a willful violation of the Act's restriction on unauthorized transfers *before* approving the transfer and assessing a fine. In contrast, in this case the Commission truncated a renewal proceeding prior to finally resolving the issues which had been designated for hearing. We also note that the qualifications of the incumbent licensees were not at issue in *Bartell* and *Areawide.* Instead of a substantive qualifications violation, those cases dealt with the fact that ostensibly acceptable transfers had been effected by the incumbent licensee without the official authorization of the Commission.

We agree with petitioners that the relief granted by the Commission in this case constitutes a substantive departure from *Jefferson Radio* which warrants a reasoned explanation. Moreover, if on remand the Commission chooses to modify this policy, it must articulate clearly the content and scope of the new policy. In particular, if the former bar to transfers at full market value is to be replaced with a "balancing" test that weighs, *inter alia,* the degree of misconduct in question (even though a final determination will not have been made on this issue), the Commission should explain what constitutes serious misconduct sufficient to bar profits. Alternatively, the Commission may complete the proceedings that were pending at the time it approved the settlement agreement and then fashion a remedy that furthers the goals of its stated and known policies.

### III

We find that HBLP, TVL, and HBS have standing as prospective competitors to challenge the Commission's approval of the settlement agreement and transfer to Hallmark. We uphold the Commission's decision not to accept competing applications for the licenses in question. We find that the Commission violated its policy, as upheld in *Jefferson Radio,* of precluding assignment at full value of a broadcast license until it has finally determined that the assignor has not forfeited its right to a license. Therefore, we remand to the Commission to complete the proceeding pending at the time the settlement agreement was approved or to articulate a new policy that explains why *Jefferson Radio* is no longer an appropriate precedent and to justify the transfer to Hallmark without completing the pending renewal proceeding.

*It is so ordered.*

STEPHEN F. WILLIAMS, Circuit Judge, dissenting in part and concurring in part of the judgment:

After extensive hearings before an administrative law judge, the FCC here approved a settlement that was satisfactory to all active participants in the administrative proceedings. Under its terms the FCC renewed Spanish International Communications Corporation's disputed licenses but required their transfer to a third party. At

the behest of two firms that may, for all we know, be no more than litigative shells, that played no material role in the administrative proceedings involving renewal, and that made no timely filings seeking comparative hearings for the licenses, the court today upsets the settlement. As I believe that neither firm has suffered a material injury, I dissent.

The two firms, Hispanic Broadcasting System and Hispanic Broadcasting Limited Partnership, claim standing as prospective license applicants. But as neither ever filed a timely application for the license they seek, neither appears before us as a runner-up, as did the petitioner in *Orange Park Florida T.V., Inc. v. FCC*, 811 F.2d 664 (D.C.Cir.1987), or even as a defeated contestant. In fact, if these parties are serious about competing for the stations (should they become vacant), they haven't told us about it, and their performance before both the Commission and the court supplies no basis for believing they are. They appear more as observers who have been lollygagging around the track while others strove. They have not demonstrated the "personal stake in the outcome of the controversy" necessary to satisfy the constitutional requirements of Article III. *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (internal quotations omitted).

It is true, of course, that nonrenewal of Spanish International's licenses, if it were ultimately to result from invalidation of the settlement, would create vacancies for which HBS and the Partnership could compete. Given the edge the Commission allows incumbents in a comparative hearing, see *Central Florida Enterprises, Inc. v. FCC*, 683 F.2d 503 (D.C.Cir.1982) ("renewal expectancy" of incumbent licensee may be a factor in comparative proceedings), the existence of a vacancy is a potential advantage. Further, neither a potential license contestant, nor a disappointed bidder, nor others claiming standing on comparable grounds, is by any means required to show for purposes of standing that it would have carried off the prize but for the alleged illegality. See, e.g., *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (plaintiff seeking federal housing assistance); *Regents of the University of California v. Bakke*, 438 U.S. 265, 280–81 n. 14, 98 S.Ct. 2733, 2742–43 n. 14, 57 L.Ed.2d 750 (1978) (medical school applicant); *CACI, Inc.–Federal v. United States*, 719 F.2d 1567, 1574–75 (Fed.Cir.1983) (disappointed federal contract bidder). Finally, in many such cases courts have framed the complainant's injury simply as the loss of an *opportunity* to compete. See, e.g., *C C Distributors, Inc. v. United States*, 883 F.2d 146, 151 (D.C. Cir.1989) (disappointed bidder).

This hardly means, however, that anyone can wander in off the street, pronounce himself a potential contestant, and thereby recruit the courts to upset a decision of a coordinate branch of government. See Antonin Scalia, The Doctrine of Standing as an Essential Element of the Separation of Powers, 17 Suffolk U.L.Rev. 881 (1983). Some indication of realistic prospects is also needed. As Judge Posner has observed, a medical school applicant could challenge a racial exclusion without proving that in its absence he would be admitted, but "he would not have standing if he was two years old." *Planned Parenthood Ass'n of Chicago v. Kempiners*, 700 F.2d 1115, 1137 (7th Cir.1983) (concurring); see also *Doherty v. Rutgers School of Law–Newark*, 651 F.2d 893 (3rd Cir.1981) (no standing to challenge affirmative action program where plaintiff was otherwise clearly unqualified for admission).

The rationale for requiring an indication of serious prospects is simple enough: a lost opportunity is no loss at all if there is no realistic chance of winning once the supposed illegality is corrected. Those who without such prospects nonetheless bring suit are presumably either seeking to enjoy its nuisance value, see *National Federation of Federal Employees v. Cheney*, 883 F.2d 1038, 1053 (D.C.Cir.1989), or acting out of the sort of ideological interest that the Supreme Court has declared insufficient to confer standing. See, e.g., *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

In instances where an agency has held a contest and the plaintiff entered, it is typically plain from the record whether its prospects were serious. In the disappointed bidder cases that has often been true, and there we have insisted that the

petitioners have been " 'within the zone of active consideration' for the bid's award." *National Federation*, 883 F.2d at 1053 (quoting *National Maritime Union v. Military Sealift Command*, 824 F.2d 1228, 1237–38 n. 12 (D.C.Cir.1987)). In many cases disappointed contract bidders found to have standing were in fact runners-up in the contest whose validity was challenged. See, e.g., *Choctaw Manufacturing Co. v. United States*, 761 F.2d 609, 613 (11th Cir. 1985); *CACI, Inc.*, 719 F.2d at 1575; *Armstrong & Armstrong, Inc. v. United States*, 514 F.2d 402 (9th Cir.1975); but cf. *Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 842 & n. 3 (D.C.Cir. 1982) (dictum that second-lowest bidder in original procurement had not shown enough likelihood of success on recompetition to challenge agency's failure to terminate contract). Similarly, in *Orange Park*, an FCC case where we drew heavily on the disappointed bidder analogy, the plaintiff was the sole other applicant for the contested license. But for the Commission's alleged error in allowing the winning applicant to make a curative amendment, plaintiff could have itself made an amendment curing its only apparent deficiency. 811 F.2d at 670–73.

I have considerable doubt whether the present case calls for anything less than a showing by HBS and the Partnership that they were within the "zone of active consideration"—which they obviously were not. It is not the FCC's fault, but theirs, that we have no clue as to their qualifications; these parties could have fought for Spanish International's licenses in what would have been the equivalent of an open contest. The complaint questioning Spanish International's qualifications was filed with the Commission in 1980, see J.A. 16 (designation order), and yet neither HBS nor the Partnership submitted competing applications for three Spanish International licenses up for renewal in 1982 and 1983, see *Spanish International Communications Corp.*, 2 FCC Rcd 3336, 3337 (1987), at which times the Commission would have been required under its regulations to accept conforming submissions. See 47 CFR § 73.3517(e) (1988). (The cut-off rules do not kick in during the investigation of such complaints, but only when designation for hearing occurs—in this case, not until June 1983.) The only applications they did manage to proffer were no less than three, and as many as seven, years late. See *Spanish International*, 2 FCC Rcd 3336, 3336–37, 3342 n. 8 (1987). Since the settlement they have passed up further opportunities to compete. See Commission Brief 29 n. 20 (no competing applications were filed against Hallmark's requests for license renewal after the settlement). These parties were not even also-rans, much less runners-up.

Nonetheless, one might argue that HBS's and the Partnership's prospects should be tested as if they had had no opportunity to compete, on the theory that Spanish International's status as incumbent made their opportunities so unappealing as to excuse their failure to apply. (This requires disregard of Spanish International's vulnerability once its qualifications were challenged.) Where for some reason no contest has been run, or the plaintiff for some other reason has had no chance to demonstrate whether it would place, courts have applied laxer standards. Thus in *C C Distributors*, allegedly illegal action cut off any opportunity to bid, but we relied on plaintiffs' "demonstrated capacity to compete for and to obtain [similar] contracts" as assurance that an opportunity to compete "would not be illusory." 883 F.2d at 151. See also *Hayes International Corp. v. McLucas*, 509 F.2d 247, 251 (5th Cir.1975) (petitioner had held contract similar to one whose award was challenged).

HBS and the Partnership would go even farther, relying on *MG–TV Broadcasting Co. v. FCC*, 408 F.2d 1257 (D.C.Cir.1968), for the notion that a possible license applicant can secure standing whenever the denial of others' applications (which here would follow *if* agency proceedings took a favorable turn on remand) "would have left the station vacant and available for appellant's application." *Id.* at 1264 n. 24. If correct, of course, such a rule would afford *anyone* standing, as any vacancy creates such a theoretical opportunity for the whole world. But the court's five lines of footnote addressing the point do not suggest that anyone had raised the issue of MG–TV's prospects, and indeed no party had raised the standing issue at all. See Briefs of the Commission, MG–TV Broadcasting Co., and Intervenor Seven Arts

Broadcasting Co., Inc., *MG–TV Broadcasting Co. v. FCC,* 408 F.2d 1257 (D.C.Cir. 1968) (No. 21,224). To the extent that *MG–TV* represents such a holding, our later decision in *Orange Park,* which wrestled at some length with the problem and did not find *MG–TV* worthy of citation, clearly supersedes.[1]

It is true that *Orange Park* eschewed any prediction of the likelihood of the plaintiff's ultimately prevailing. 811 F.2d at 672–73 n. 18. But we reached that conclusion only after having determined that plaintiff "has devised plans sufficiently detailed to enable it to compete for the facility." *Id.* The court emphasized that the petitioner could readily cure the deficiency in its original submission, that it stood "ready, willing and able" to reapply for the license, and that its intention to do so was "manifestly evident" from the record. *Id.* at 672–73 & n. 18. These represent the minimum requirements that one can extract from our cases.

Thus I turn to the record in a search for some hint that, if court action led to HBS's or the Partnership's having an opportunity to compete, it would be better than "illusory." None appears. As noted, neither HBS nor the Partnership made any timely application for the licenses. Nor did either see fit even to join in the initial battle to unseat Spanish International. Such a commitment would have been at least an earnest of seriousness. Under Commission regulations, either could have petitioned to intervene in the proceedings as a matter of course within 30 days of the designation order of June 16, 1983. See 47 CFR § 1.223 (1988) (rules for intervention); J.A. 15 (designation order). The Partnership's attempt to intervene fell three years too late, and the Review Board rejected its petition as "grossly out of time and defective." *Spanish International,* 1 FCC Rcd 844, 847 n. 2 (Rev.Bd.1986). Its sole excuse, that it was not yet in existence by the relevant deadline, see J.A. 377, only underscores the ramshackle character of its interest. (The Commission upheld the Review Board's ruling on intervention, and afforded the Partnership only *amicus* sta-

tus. *Spanish International,* 2 FCC Rcd at 3338 n. 15.)

HBS did manage to participate, but very indirectly, and in what was perhaps the least promising avenue for challenging the Commission's consideration of the transaction. Instead of petitioning to deny the conditional renewal of Spanish International's license, it attacked only the transferor's application to assign the license once renewed. J.A. 146. As even the Partnership concedes, this track did "not ... provide[ ] a meaningful opportunity to challenge the decision to permit the settlement," Partnership Brief 20 n. 6, since Commission assent to renewal would necessarily entail assent to the assignment.

Finally, even before the court the roles of HBS and the Partnership suggest the improbability that either would be "ready, willing and able" to compete on a serious basis for the licenses should they fall vacant. Neither party asserts that it would in fact qualify as a licensee, cf. *DKT Memorial Fund, Ltd. v. AID,* 810 F.2d 1236 (D.C.Cir.1987), nor do they stoop even to state that they intend to compete for the stations should the vacancies occur. Neither has offered reason to believe that, in *Orange Park's* words, it "has devised plans sufficiently detailed to enable it to compete for the facility." 811 F.2d at 672–73 n. 18. See also *Public Citizen v. Lockheed Aircraft Corp.,* 565 F.2d 708, 717–19 (D.C.Cir. 1977) (no injury sufficient to challenge excess property sale where plaintiff had not demonstrated capacity to compete for purchase). Nor is this a case in which the mere fact of appeal might allow us to assume such qualification or intention. See *National Maritime,* 824 F.2d at 1237 n. 12 ("[p]resumably a bidder who believed that it would have no significant likelihood of obtaining the bid on re-solicitation would not bring suit"). As HBS appears simply as one signer of a joint brief with the closely related viewer petitioners, its continued role is as easily attributable to the interest in providing a back-up theory of standing as to any real interest in seeking the licenses. (It did not even bother to appeal the Commission's dismissal of its

---

**1.** The various opinions in *Shurberg Broadcasting v. FCC,* 876 F.2d 902 (D.C.Cir.1989), assumed standing and did not assess the seriousness of Shurberg's quest. In any event, cases in which

jurisdiction is assumed are not authority for the existence of jurisdiction. *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 119, 104 S.Ct. 900, 918, 79 L.Ed.2d 67 (1984).

belated applications.) As for the Partnership, a successful challenge to the Commission's cut-off rules would have made it the sole candidate for the licenses other than Spanish International.[2] But that alone gives no hint that it would be anywhere near the ballpark in an *open* competition, which is the sort that could result here and which would likely attract some heavy hitters. Thus, what distinguishes HBS and the Partnership from the rest of the world is that they belatedly filled out a few forms. That is not enough.

By contrast, TVL was plainly within the zone of active consideration. It was one of two finalists in the sales process supervised by the California district court, at least three other bidders having been eliminated elsewhere along the way. At the time the court approved Hallmark's offer TVL had firm financing commitments for $250 million of a $320 million bid; within a mere three days it had lined up the other $70 million. If its claim of racial discrimination in the district court proceedings were meritorious, and if Commission approval of the settlement in the face of such discrimination were substantively invalid, its proposed remedy—delay of the settlement to allow reconsideration of its original bid in the light of its later acquisition of full financing—would plausibly give it a shot at the licenses. As TVL does not challenge the settlement on *Jefferson Radio* grounds, however, its standing provides no support for today's outcome.[3]

As the majority finds standing for HBS and the Partnership it need not resolve that of the self-identified viewer petitioners, the Coalition for the Preservation of Hispanic Broadcasting and Susan Jaramillo. Maj.

Op. at 1354–1355. As the court notes, there is no evidence to suggest that Congress adopted § 310(b)(3)'s restrictions on alien control in order to advance the public's interest in programming content. Indeed, such evidence as the parties have uncovered suggests a national security purpose. See Maj. Op. at 1351. Moreover, whatever may have animated Congress, it surely did not *restrict* foreign license ownership in order to *enhance* non-English-language programming. Thus the Coalition's interest in preserving Spanish-language programming, J.A. 390, is "so ... inconsistent with the purposes implicit in the statute" that their standing would be wholly inappropriate. See *Clarke v. Securities Industry Ass'n,* 479 U.S. 388, 399, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987).

For her part, Jaramillo objects to "foreign domination" of the supply of Spanish-language programming, J.A. 491, so that if § 310(b)(3) reflected any interest in programming content, she might occupy at least a non-adverse relation to its goals. But her standing fails for want of a material injury. Since the settlement eliminated the possibility of alien domination over the stations, her interest in all-American Spanish-language programming could benefit from this litigation only to the extent that Commission rejection of the settlement might have tended to deter future violations of § 310(b). This is too speculative to satisfy Article III. Compare *Linda R.S. v. Richard D.,* 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973) (invalidation of state's refusal to enforce criminal non-support laws against fathers of illegitimate children bears too speculative a relation to any prospect that mother of illegitimate child would fare better in extracting child support from father).

---

**2.** Because the Commission's application of its timeliness rules prevented the Partnership from demonstrating its ability to place, it clearly could secure standing to challenge that denial without showing that it would have been "within the zone of active consideration." But without some indication of ability to meet the Commission's minimum qualifications, as required in *Orange Park,* it should not have standing even to attack the denial.

**3.** On the merits of TVL's claim, I concur in the court's result, but on somewhat different grounds. Its filings before the Commission never made clear its current theory that Commission approval of a transfer to Hallmark violated

the Equal Protection clause because it would incorporate or build upon the alleged discrimination in the district court proceedings. Whatever the merits of this claim, it appeared before the Commission more as a wholly implausible effort to get the Commission to set itself up in judgment over the district court and Ninth Circuit on constitutional matters, with no explicit claim of discrimination *by* the Commission. See TVL Petition to Deny, Sept. 26, 1986 (J.A. 213); TVL Application for Review, July 24, 1987 (J.A. 458). Accordingly, it fails under the principle that a sow's ear argument before an agency does not require the agency to make a silk purse response. See *City of Vernon v. FERC,* 845 F.2d 1042, 1047 (D.C.Cir.1988).

Nor can either the Coalition or Jaramillo stand upon the purposes of the *Jefferson Radio* doctrine, for it is entirely instrumental, aimed only at enhancing the deterrent effect of whatever substantive provision supports the attack on the incumbent licensee, here § 310(b)(3). See *Stereo Broadcasters, Inc. v. FCC,* 652 F.2d 1026, 1027 (D.C.Cir.1981).

Thus, of the four petitioners who challenge the settlement on *Jefferson Radio* grounds, three show no material injury and the Coalition asserts an interest that is in apparent conflict with the purposes of § 310(b). Yet at the behest of the two purported license applicants the court today upsets a carefully arranged and (so far as appears) useful agreement. The settlement cures whatever violation of § 310(b)(3) may have existed. It frees Commission time for other matters. It satisfies the group that pressed the § 310(b)(3) challenge before the Commission, the Spanish Radio Broadcasters Association. And, so far as *Jefferson Radio*'s object of maintaining deterrent effect is concerned, the record reveals no hint that violations of § 310(b)(3) are so widespread as to require much deterrence.

\*    \*    \*    \*    \*    \*

As I believe that we have no jurisdiction over the *Jefferson Radio* issue, I neither join nor dissent from the opinion on that point. But compare *McKelvey v. Turnage,* 792 F.2d 194, 209 (D.C.Cir.1986) (Scalia, J., dissenting from jurisdiction but joining on merits). A few words may be in order, however, lest the majority opinion be misinterpreted on remand. Compare *Atari Games Corp. v. Oman,* 888 F.2d 878, 879 (D.C.Cir.1989) (Silberman, J., concurring). As I understand the opinion, it reads the Commission's *Jefferson Radio* doctrine as absolute, one of unwavering unwaivering, subject only to specific, discrete exceptions. The Commission's fault is the perceived inadequacy of its explanation for softening the doctrine. On remand, therefore, the Commission is free, for example, to explicitly change the doctrine into a balancing test, so long as it explains adequately. See, e.g., *NLRB v. Local Union No. 103,* 434 U.S. 335, 351, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978) ("[a]n administrative agency is not disqualified from changing

its mind"); *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir. 1971).

Whatever the merits of the majority's reading of *Jefferson Radio,* I am puzzled by its concern over the Commission's decision not to pursue the claims of Spanish Radio Broadcasters of America that Spanish International had brought antitrust actions against it as a form of harassment. Maj. Op. at 1361–1362. The ALJ rejected these claims as lacking sufficient evidence of bad faith, and the claimant has withdrawn them as part of the settlement. The court expresses concern that the withdrawal may have been motivated by an exchange of consideration. *Id.* at 1362. I would not be surprised; that is how many conflicts before the FCC come to an end. But if the Commission must press every *abandoned* suggestion of hanky-panky through to the bitter end, or must satisfy itself that the accuser in retreat was pure of heart, uncorrupted by any trade-off, it will never be able to get on with its business. The FCC is not some sort of general morals police.

That aside, regardless of what course the Commission might take on remand, the context—agency choice among remedies—requires much discretion for the agency and deference from the court. See, e.g., *Moog Industries, Inc. v. FTC,* 355 U.S. 411, 413, 78 S.Ct. 377, 379, 2 L.Ed.2d 370 (1958) (noting resource allocation problem and need for specialized, experienced judgment). Remedial choices demand both a grasp of the scope of the evil to be remedied (and thus how much deterrence is needed), and a predictive judgment as to deterrent effects. Judges are unlikely to be able to contribute much on either issue. See generally *FCC v. WOKO, Inc.,* 329 U.S. 223, 228–29, 67 S.Ct. 213, 215–16, 91 L.Ed. 204 (1946); *West Coast Media, Inc. v. FCC,* 695 F.2d 617, 622 (D.C.Cir.1982); *Lorain Journal Co. v. FCC,* 351 F.2d 824, 831 (D.C.Cir.1965). Moreover, the need for judicial deference is at its peak where (as here) the remedy is secured as part of a settlement. The Commission is effectively making a decision as to the allocation of its resources—a decision whether the gain in deterrent effect that might flow from pursuing the case to the hilt is worth the loss, in terms of energy deflected from other matters. See *Board of Trade v. SEC,* 883

F.2d 525, 530–31 (7th Cir.1989) ("declining a particular case hardly means that the [agency's staff] will go twiddle their thumbs"); cf. *Heckler v. Chaney,* 470 U.S. 821, 831–32, 105 S.Ct. 1649, 1655–56, 84 L.Ed.2d 714 (1985). Oddly, if the Commission on remand were to affirm the ALJ's finding of a violation, it could settle with Spanish International untrammeled by the *Jefferson Radio* doctrine and in full enjoyment of the deference that is well-established for remedial choices. See *Bartell Broadcasting Inc.,* 19 FCC2d 890 (1969); *Areawide Communications, Inc.,* 12 FCC2d 170 (1968) (both allowing transfer at full market value despite licensee violations of 47 U.S.C. § 310(d)).

We should not interfere with the Commission on this matter, at the instigation of parties with such feeble stakes.

## ORDER

Opinion for the Court filed *Per Curiam.*

PER CURIAM: Before us is the petition of Hispanic Broadcasting Limited Partnership ("HBLP") to supplement the relief ordered in this case by directing the FCC to require the parties to restore the *status quo ante* which existed prior to and pending completion of the renewal proceedings at issue in this case. In the opinion, we remanded the case to the Commission with instructions either (1) to complete the renewal proceedings that were pending at the time the Commission approved a transfer of the subject licenses to Hallmark Cards, Inc.; or (2) to articulate and explain a new policy that would modify the Commission's long-standing policy forbidding assignment at full value of broadcast stations while proceedings on the incumbent licensee's qualifications or pending completion. We decline to grant HBLP's request that we order the Commission not to allow Hallmark to continue operating the stations during the remand proceedings. We do not believe that such an order is in any way a necessary or appropriate aspect of remedying the error found. Were we to require forthwith the disestablishment of Hallmark as the licensee, the remand proceedings would only be delayed further. The Commission decided to approve the transfers in question more than two years ago. We expect that on remand the Commission will proceed with reasonable dispatch so that the question of permanent authorization can be resolved promptly, finally, and without interim remedies. Nor can we assume that the Commission will feel compelled by the fact of Hallmark's tenure as the licensee simply to ratify its earlier decision approving the transfer of the several stations. A central purpose of administrative law is to require reasoned decision making on the part of federal agencies. If, upon remand, the Commission came to the conclusion that Hallmark was required to vacate the licenses, a risk that Hallmark assumed will have materialized, and we assume that the Commission will do what is necessary.

